Argued and submitted July 8, vacated and remanded with instructions to dismiss
case as moot November 16, 2005

CRANDON CAPITAL PARTNERS,
derivatively on behalf of
Willamette Industries,
a nominal defendant,
*Appellant,*

*v.*

Stuart J. SHELK, Jr.;
Paul N. McCracken; Michael G. Thorne;
Gerard K. Drummond; Kenneth W. Hergenhan;
Robert M. Smelick; Benjamin R. Whiteley;
Winslow H. Buxton; G. Joseph Prendergast;
William Swindells; and Duane C. McDougall,
*Defendants,*

*and*

WILLAMETTE INDUSTRIES, INC.,
*Respondent.*

0011-11691, 0011-11695; A123575 (Control),

Rae Ann BROWN,
derivatively on behalf of
Willamette Industries,
a nominal defendant,
*Appellant,*

*v.*

WILLAMETTE INDUSTRIES, INC.,
*Respondent,*

*and*

William SWINDELLS;
Duane C. McDougall; Gerard K. Drummond;
Paul N. McCracken; Stuart J. Shelk, Jr.;
Michael G. Thorne; Kenneth W. Hergenhan;
Robert M. Smelick; Benjamin R. Whiteley;
Winslow H. Buxton; and G. Joseph Prendergast,
*Defendants.*

0011-11695; A123576
(Cases Consolidated)

123 P3d 385

Michael J. Barry, Wilmington, and A. Rick Atwood, Jr., San Diego, argued the cause for appellants. On the opening brief were Gary M. Berne and Stoll Stoll Berne Lokting & Shlachter P.C., and Justine Fischer and Law Offices of Justine Fischer, and Edwin A. Harnden and Barran Liebman LLP. With them on the reply brief was Scott A. Shorr.

John F. Neupert argued the cause for respondent. With him on the briefs were Bruce L. Campbell and Miller Nash LLP.

Before Haselton, Presiding Judge, and Armstrong and Rosenblum, Judges.

HASELTON, P. J.

**HASELTON, P. J.**

Plaintiffs appeal the trial court's judgment denying attorney fees in this corporate derivative suit. Defendant[1] raises several cross-assignments of error, arguing, in part, that, because the merits of the underlying dispute had become moot before the trial court addressed plaintiffs' asserted entitlement to fees, the trial court lacked jurisdiction to enter any judgment other than a judgment of dismissal. We agree with defendant. *See Kay v. David Douglas Sch. Dist. No. 40*, 303 Or 574, 738 P2d 1389 (1987), *cert den*, 484 US 1032 (1988). Accordingly, we vacate the trial court's judgment and remand with instructions to dismiss the case as moot.

The facts that are material to our analysis and disposition are undisputed. This litigation arose from the proposed, and eventually completed, acquisition of Willamette Industries, Inc. (Willamette) by Weyerhaeuser Co. (Weyerhaeuser). Plaintiffs, Crandon Capital Partners (Crandon) and Rae Ann Brown (Brown), owned shares of Willamette.

In November 2000, Weyerhaeuser offered to purchase all of Willamette's outstanding shares for $48 per share. That $48 offer was greater than the value of the stock at that time. Willamette rejected Weyerhaeuser's offer outright. On November 14, 2000, several days after Willamette's rejection, plaintiffs Crandon and Brown simultaneously filed derivative lawsuits on behalf of Willamette against the corporation and its directors. Those two suits, which were filed in Multnomah County Circuit Court, were consolidated on December 20, 2000.

In their first consolidated complaint, plaintiffs alleged claims for breach of fiduciary duty, abuse of control, and waste, all arising from Willamette's rejection of Weyerhaeuser's offer. Plaintiffs alleged that Willamette's directors refused to consider Weyerhaeuser's offer in good

---

[1] "Defendant" refers to the sole respondent on appeal, Willamette Industries, Inc.

faith and that the directors used unlawful entrenchment measures (a series of "golden parachutes"[2] and "poison pills"[3]) to deter Weyerhaeuser's potential acquisition. Plaintiffs' prayer for relief sought an injunction eliminating the alleged entrenchment measures, attorney fees, and damages.

During the pendency of the litigation, Weyerhaeuser continued in its attempt to purchase Willamette. However, on December 10, 2001, Willamette announced that it was beginning its own negotiations with Georgia Pacific Corp. (GP) to purchase GP's building products division. Weyerhaeuser made it clear that the proposed deal with GP would render Willamette undesirable and that, if the transaction were completed, Weyerhaeuser would discontinue its efforts to acquire Willamette.

Crandon and Brown regarded the potential GP transaction as a further entrenchment measure (a "suicide pill") designed to thwart Weyerhaeuser's advances. Consequently, on December 18, 2001, plaintiffs filed a second amended complaint, which styled the proposed GP transaction as an unlawful entrenchment measure; plaintiffs again sought an injunction, attorney fees, and damages.

On January 4, 2002, Willamette stockholder Wyser-Pratt Management Co. (Wyser-Pratt) filed a derivative complaint in Multnomah County Circuit Court.[4] Like plaintiffs' second amended complaint, the Wyser-Pratt complaint was

---

[2] "A golden parachute is a contractual arrangement between [a corporation] and one or more executive officers whereby the [corporation] promises to provide the executive with substantial benefits over and above those the executive would normally receive if the officer is terminated as a result of a change in corporate control." Carol Goforth, *Proxy Reform as a Means of Increasing Shareholder Participation in Corporate Governance: Too Little, But Not Too Late*, 43 Am U L Rev 379, 424 n 271 (1994).

[3] "Poison pills, often euphemistically labeled by their creators as 'shareholder rights plans' are a variety of options or other rights issued to shareholders, effective only when another party buys a specified percentage of stock or otherwise makes an unwelcome move toward control of the corporation." Robert C. Art, *Takeover Legislation: Oregon's Four Approaches to Corporate Protection*, 30 Willamette L Rev 223, 226 n 11 (1994).

[4] At approximately the same time that Wyser-Pratt filed its complaint in the state court, another shareholder, Van Zwoll, filed a similar action in federal district court.

filed in response to the proposed GP transaction and also sought injunctive relief precluding such a transaction.

Willamette moved to consolidate the Wyser-Pratt action with the previously filed Crandon and Brown actions. Wyser-Pratt moved for expedited discovery and a preliminary injunction to stop the GP acquisition. On January 16, 2002, the trial court heard arguments on both Willamette's motion to consolidate and Wyser-Pratt's motion for expedited discovery. Although attorneys for Crandon and Brown were present at the hearing, only attorneys for Wyser-Pratt presented argument. After ruling that the three actions would be consolidated, the court commented:

> "[I]t seems to me, from the plaintiffs' allegations, [that the GP acquisition is] something that would in fact—affirmative steps, maybe not completed yet, but affirmative steps that would prevent the takeover and entrench the board."

After the court made those comments, but before the court rendered any ruling, Willamette's attorneys stipulated that Willamette would allow at least 48 hours between the time it announced an agreement with GP and the time it finalized that transaction. The 48-hour waiting period would allow plaintiffs and the court to review the final terms of any acquisition agreement.

On January 21, 2002, Willamette accepted Weyerhaeuser's offer and agreed to sell at a price of $55.50. Thereafter, the tender price was paid out to the shareholders. Plaintiffs never sought to restrict or enjoin the distribution of any part of those funds as a possible source of the payment of attorney fees.

On March 21, 2002, two months after Willamette accepted Weyerhaeuser's offer, plaintiffs filed a motion for an award of attorney fees. The gravamen of that motion was that plaintiffs were entitled to attorney fees because plaintiffs' efforts had "force[d] defendants to comply with their fiduciary obligations to the Company and its shareholders and respond to Weyerhaeuser's offers in good faith." Plaintiffs contended further:

> "Now, after 15 months of litigation, defendants have finally caved in, removed their improper defensive measures,

agreed to a merger between Willamette and Weyerhaeuser, and abandoned a proposed acquisition by Willamette of the liability-ridden building products division of [GP]. By acquiescing to demands made by plaintiffs, defendants have conceded to plaintiffs' primary claims. Continued litigation of plaintiffs' claims is not necessary as plaintiffs have obtained the substantive relief they sought."

The court denied that motion based on defendants' assertion that plaintiffs' second amended complaint did not comply with ORCP 68. However, the court, over defendants' objections, allowed plaintiffs to file a third amended complaint solely to seek fees.

■ On December 5, 2003, after a series of motions and hearings related to plaintiffs' third amended complaint, the trial court held a hearing addressing issues of fee entitlement. Ultimately, after reviewing voluminous submissions on fee entitlement in corporate derivative suits, with particular emphasis on Delaware case law addressing arguably analogous circumstances, the court determined that plaintiffs were not entitled to recover fees. That ruling rested on two principal premises: First, the primary benefit that plaintiffs had sought was enhancement of the price of Willamette shares, including through Willamette's acceptance of Weyerhaeuser's tender offer. Second, in derivative cases involving claims for attorney fees based on securing such a common pecuniary benefit, a plaintiff is required to enjoin the distribution of at least a portion of the tender price so as to segregate and maintain a fund from which fees can be paid by those who benefitted from the attorneys' efforts. That is, as an equitable matter, the benefitted shareholders of the acquired company—and not the shareholders of the acquiring company—should bear the cost of efforts that increased the buyout price. Because that prerequisite was not met here—the tender price had been fully disbursed—plaintiffs could not recover fees. The trial court explained:

"[W]hat I see in all of these [Delaware] cases is that the * * * common fund or corporate benefit exception is a[n] exception to the American rule for attorneys fees, and it is based on the notion that it would be more equitable to require those who are benefitted to pay the attorneys fees and that it enhances certain public policies in terms of

encouraging enforcement of shareholders' rights to do that. But the first and foremost underlying premise is those who benefitted should pay, whether it's common fund or corporate benefit.

"The gravamen of the benefit in this case, even though it would be extremely difficult [to measure] is, in fact, in the increased dollar value received by the shareholders as a result of Willamette's board finally agreeing to the tender offer and, frankly, driving up Weyerhaeuser's bid. And it's for that reason that this method of having funds segregated for the tender offer for the payment of fees and expenses has been developed, because that's the benefit * * * even if you characterize it as a dismantling of these barriers and elimination of this improper entrenchment activity, the bottom line is that it only matters because the price for shareholders went up, they got more value. But they were cashed out. They didn't become shareholders in the new corporation * * *. And I conclude that * * * the plaintiffs having shown no good reason not to have sought a segregation of the funds, it would be inequitable at this point to require the successor to pay the attorney fees."

Crandon and Brown now appeal.[5] They contend, variously, that the trial court misconstrued and misapplied the law pertaining to the recovery of attorney fees under a corporate "common benefit" theory and that the court was wrong in concluding that, in the absence of a retained monetary fund, it would be inequitable to require Weyerhaeuser, as defendants' successor, to pay plaintiffs' attorney fees.

Defendant disputes those arguments and, further, raises a variety of cross-assignments of error. Two of those cross-assignments are closely related and pertain to matters that necessarily precede our consideration of plaintiffs' arguments: (1) The trial court erred in failing to dismiss this case because the merits of the parties' underlying dispute had been mooted long before the court entered judgment denying attorney fees; and (2) even if the case was not moot, the court erred in failing to deny fees on the ground that, because plaintiffs had not "prevailed" in the underlying litigation, they could not recover attorney fees.

---

[5] Wyser-Pratt does not appeal.

The first of those cross-assignments is dispositive. For the reasons that follow, we conclude that the trial court lacked jurisdiction to consider plaintiffs' request for fees.

We begin with an overview of Oregon's mootness doctrine. Under Oregon law, a case becomes moot when the interests of the parties cease to be adverse, *Barcik v. Kubiaczyk*, 321 Or 174, 182, 895 P2d 765 (1995), or when "a court's decision no longer will have a practical effect on or concerning the rights of the parties[.]" *Brumnett v. PSRB*, 315 Or 402, 406, 848 P2d 1194 (1993). "Mootness is a species of justiciability, and a court of law exercising the judicial power of the state has authority to decide only justiciable controversies." *First Commerce of America v. Nimbus Center Assoc.*, 329 Or 199, 206, 986 P2d 556 (1999). Thus, "[i]n Oregon, the judicial power simply does not extend to moot or otherwise nonjusticiable matters." *Starrett v. City of Portland*, 196 Or App 534, 539, 102 P3d 728 (2004).

Here, Willamette's acceptance of Weyerhaeuser's tender offer and Weyerhaeuser's consequent acquisition of Willamette rendered plaintiffs' claims in the derivative litigation nonjusticiable. There no longer was any live controversy with respect to the compelled dismantling of the alleged "entrenchment measures." The question reduces to whether that mooting of the "merits" of the parties' dispute deprived the trial court of jurisdiction to adjudicate plaintiffs' alleged entitlement to attorney fees. *Kay* is dispositive.

In *Kay*, a group of high school students, and the parent of one of the students, sought declaratory and injunctive relief against inclusion of a formal prayer at David Douglas High School's 1984 graduation ceremony. The plaintiffs' complaint focused solely on that ceremony without seeking "more general relief against future practices of defendants." *Kay*, 303 Or at 576. At a show cause hearing, the trial court rendered "an oral opinion" that the requested injunctive relief should be allowed and "announc[ed] that 'that will be the Order of this Court.'" *Id.* at 576-77. However, the court did not contemporaneously enter a written order. The graduation ceremony then occurred.[6] On June 28, 1984, more than

---

[6] The school administration, in response to the court's comments, eliminated the formal prayer from the graduation program. *Kay v. David Douglas Sch. Dist.*

one month after the graduation ceremony, the court signed a judgment that granted the requested equitable relief. The court's order enjoined the defendants from including a formal prayer in "commencement exercises for the 1984 graduating class" of the high school. *Id.* at 577. In that judgment, the court also awarded attorney fees to the plaintiffs. *Id.*

The defendants appealed, and the Supreme Court remanded the case to the circuit court with instructions to vacate the judgment. The court identified the threshold "problem" as "whether a justiciable controversy between the parties existed at the time of the circuit court's judgment." *Id.* In that regard, the court observed:

> "A party with standing under the various applicable tests might, of course, seek relief against future repetitions of the challenged governmental act, but these plaintiffs presented no such claims to the circuit court. And a court cannot either mandate or enjoin an act after it has been completed, at least not until the cosmological theory of reversible time is better established."

*Id.* The court then determined that the trial court's oral remarks at the show cause hearing did not constitute an "order or a judgment." *Id.* at 578. Accordingly, the court concluded:

> "[T]here was no effective judgment until it was signed and entered according to ORCP 70 B. On the face of the pleadings and the interests asserted by these plaintiffs, there was by that date nothing for the court to decide. The circuit court should have dismissed the proceedings after the commencement exercises were over. * * * *As the judgment for attorney fees would fall along with the belated judgment entered by the circuit court*, defendants' reason for maintaining their appeal also would disappear."

*Id.* at 579 (footnotes omitted; emphasis added).

Our own decisions accord with that analysis. For example, in *Tanner v. OHSU*, 157 Or App 502, 971 P2d 435 (1998), we held that an award of fees against certain defendants was jurisdictionally erroneous because the underlying

---

*No. 40*, 484 US 1032, 1033, 108 S Ct 740, 98 L Ed 2d 775 (1988) (White, J., dissenting from denial of certiorari).

merits as to those defendants had become moot prior to the judgment. In *Tanner*, three employees of OHSU sought relief from the denial of health benefits to their same-sex partners. They named OHSU and a group of related state agencies as defendants. The trial court granted an injunction and attorney fees to the plaintiffs against all defendants. However, before entry of the trial court's judgment, the legislature had transformed OHSU into a public corporation that operated independently of the various state agency defendants. *Id.* at 505. After the judgment, but before the appeal, OHSU adopted new policies allowing same-sex partner benefits; however, OHSU continued to maintain on appeal that it was not legally obligated to extend benefits. *Id.* at 509.

In analyzing mootness, we distinguished between the state agency defendants and OHSU. Regarding the state agency defendants, we held that, "because at the time of the entry of judgment the trial court had no authority to enter *any* judgment against the state defendants, the entire case against those defendants—merits and award of attorney fees—is moot." *Id.* at 513 (emphasis in original). Conversely, with respect to OHSU, we held that the appeal was still justiciable because of that defendant's insistence that it was not legally obligated to extend benefits and the concurrent potential that, if the appeal were dismissed, OHSU would reinstate its former practices. *Id.* at 510; *accord Safeway, Inc. v. OPEU*, 152 Or App 349, 355, 954 P2d 196 (1998) (appeal was justiciable because, despite the fact that the defendant had unilaterally ceased the challenged conduct, the plaintiff sought to enjoin future conduct by the defendant, the defendant continued to maintain its legal entitlement to engage in the challenged conduct, and the potential for recidivism was strong).

The present case is indistinguishable substantively from *Kay*, and closely analogous to the circumstances of the state agency defendants in *Tanner*. Here, plaintiffs' claims related to the elimination of the alleged "entrenchment measures" so as to facilitate Weyerhaeuser's acquisition of Willamette. When that transaction was complete—as when the high school commencement occurred, or when the state agencies' authority over OHSU was statutorily eliminated— the parties' dispute ended. At that point, any decision of the

trial court would no longer have had "a practical effect on or concerning the rights of the parties[.]" *Brumnett*, 315 Or at 406. Consequently the court should have dismissed the case as moot.

Conversely, the circumstances here are distinguishable from those of the OHSU defendants in *Tanner* and the defendants in *Safeway*. In those cases, the plaintiffs sought to enjoin future conduct, the defendants maintained that they had a legal right to engage in future conduct, and the courts determined that a future dispute was likely. *See Tanner*, 157 Or App at 510; *Safeway*, 152 Or App at 355. None of those factors is present here. The Willamette/Weyerhaeuser transaction is complete; plaintiffs did not seek to enjoin continuing future conduct; and no risk exists in the future for the conduct at issue. To paraphrase Justice Linde in *Kay*, unless or until time can be reversed, defendants' ability to maintain entrenchment measures to thwart Weyerhaeuser's takeover ended when Weyerhaeuser took over Willamette. In sum, this is not a case where the defendants ceased their wrongful behavior only to leave themselves "free to return to [their] old ways." *Gates v. McClure*, 284 Or 685, 689, 588 P2d 32 (1978). Rather, this is a case where the parties' adverse interests simply ceased to exist.

We thus conclude that plaintiffs' claims became moot when Weyerhaeuser acquired Willamette. Thereafter, the trial court lacked jurisdiction to render any disposition other than dismissing the case for lack of justiciability. *Kay*, 303 Or at 579; *Tanner*, 157 Or App at 513.

Plaintiffs maintain, nevertheless, that they can avoid mootness by way of invoking a "catalyst theory." Under such a theory, as recognized and applied in courts in many other jurisdictions, a plaintiff may, in certain circumstances, be deemed to be a "prevailing party" entitled to attorney fees if, in response to the prosecution of litigation, the defendant has unilaterally altered its conduct and afforded the requested relief, precluding entry of judgment on the merits. *See generally Brennan v. La Tourelle Apartments*, 184 Or App 235, 244, 56 P3d 423 (2002) (addressing generic operation of the "catalyst theory"). Perhaps the most familiar recognition of the "catalyst theory" is with respect to attorney fee

awards pursuant to 42 USC section 1988 in federal civil rights litigation under 42 USC section 1983. In that context, one federal court of appeals has summarized the "catalyst theory" as follows:

> "Where a defendant voluntarily complies with a plaintiff's requested relief, thereby rendering the plaintiff's lawsuit moot, the plaintiff is a 'prevailing party' under [42 USC] section 1988 if his suit is a catalyst for the defendant's voluntary compliance and the defendant's compliance was not gratuitous, meaning the plaintiff's suit was neither 'frivolous, unreasonable [n]or groundless.' "

*Little Rock School Dist. v. Special School Dist. 1*, 17 F3d 260, 262 (8th Cir 1994) (alteration in original). Thus, the "catalyst theory," as recognized in other jurisdictions, deems the plaintiff to have "prevailed" concurrently with the defendant's (otherwise mooting) "voluntary compliance." That characterization, in turn, obviates application of the principle that the mooting of the merits before entry of judgment deprives the court of jurisdiction to award attorney fees.

Despite the prevalence of the "catalyst theory" in other jurisdictions, no reported Oregon decision has ever adopted such an approach. *See, e.g., Conifer Ridge Homeowners Assn. v. Hayworth*, 176 Or App 603, 610, 32 P3d 929 (2001) (so stating). We decline plaintiffs' invitation to do so in this case for two reasons. First, adoption of a "catalyst theory" cannot be squared with *Kay*. Although nothing in *Kay* itself addresses the potential availability of a "catalyst theory"—and our own examination of the briefing there also yields no such references—recognition of a "catalyst theory" cannot be reconciled with *Kay*'s analysis and disposition. Indeed, the plaintiffs' claims in *Kay* included a claim under section 1983, with a concomitant request for fees under 42 USC section 1988. *Kay*, 303 Or at 576, 578 n 2.

Second, even if *Kay* were, somehow, not dispositive, plaintiffs' claims here would not fall within the contours of the "catalyst theory" as it has been commonly defined and applied. In *Brennan*, a case in which we declined to apply the "catalyst theory" with respect to an entitlement to attorney fees under the fee provision of the Residential Landlord and Tenant Act, ORS 90.255, we observed:

"While the public has an interest in compliance with civil rights laws without the need for litigation and an award of attorney fees against an offender who capitulates after the action is filed will further such an interest, that kind of public interest is lacking in a dispute over whether a landlord is in possession of a tenant's property. In the latter situation, there is no fundamental principle at stake expressed by a law in which the members of the public have a direct interest. Rather, the dispute is between private parties. Indeed, to adopt a catalyst rule under such circumstances does not motivate public compliance with some fundamental concept of civil liberty. Rather it encourages costly litigation and provides a motive to seek a court-ordered remedy as opposed to settling such disputes without the need for litigation."

184 Or App at 245. The same is true here. This case involved a purely economic dispute "between private parties"; there was "no fundamental principle at stake expressed by a law in which the members of the public have a direct interest." *Id.* Thus, even if a "catalyst theory" were somehow cognizable under Oregon law, it would not apply here.

The trial court lacked jurisdiction to adjudicate plaintiffs' request for attorney fees. Accordingly, we vacate the judgment and remand it to the trial court to dismiss the case as moot. *Poddar v. Clatsop County*, 167 Or App 162, 171, 2 P3d 929, *adh'd to on recons*, 168 Or App 556, 7 P3d 677, *rev den*, 331 Or 193 (2000).

Vacated and remanded with instructions to dismiss case as moot.