Submitted on remand from the Oregon Supreme Court June 6, 2007, reversed and remanded March 26, petition for review denied July 23, 2008 (345 Or 158)

CRANDON CAPITAL PARTNERS,
derivatively on behalf of Willamette Industries,
a nominal defendant,
*Plaintiff-Appellant,*

*v.*

Stuart J. SHELK, Jr.;
Paul N. McCracken; Michael G. Thorne;
Gerard K. Drummond; Kenneth W. Hergenhan;
Robert M. Smelick; Benjamin R. Whiteley;
Winslow H. Buxton; G. Joseph Prendergast;
William Swindells; and Duane C. McDougall,
*Defendants,*

*and*

WILLAMETTE INDUSTRIES, INC.,
*Nominal Defendant-Respondent.*

Multnomah County Circuit Court
0011-11691

A123575 (Control)

Rae Ann BROWN,
derivatively on behalf of Willamette Industries,
a nominal defendant,
*Plaintiff-Appellant,*

*v.*

WILLAMETTE INDUSTRIES, INC.,
*Nominal Defendant-Respondent,*

*and*

William SWINDELLS;
Duane C. McDougall; Gerard K. Drummond;
Paul N. McCracken; Stuart J. Shelk, Jr.;
Michael G. Thorne; Kenneth W. Hergenhan;
Robert M. Smelick; Benjamin R. Whiteley;
Winslow H. Buxton; and G. Joseph Prendergast,
*Defendants.*

## Multnomah County Circuit Court
### 0011-11695
### A123576
181 P3d 773

18

Gary M. Berne, Scott A. Shorr, and Stoll Stoll Berne Lokting & Shlachter P.C., and Justine Fischer and Law Offices of Justine Fischer, and Edwin A. Harnden and Barran Liebman LLP for appellants.

Bruce L. Campbell, John F. Neupert, P.C., and Miller Nash LLP for respondent.

Before Haselton, Presiding Judge, and Armstrong and Rosenblum, Judges.

HASELTON, P. J.

**HASELTON, P. J.**

This shareholder derivative action is before us on remand from the Oregon Supreme Court. *See Crandon Capital Partners v. Shelk*, 202 Or App 537, 123 P3d 385 (2005) (*Crandon I*); *Crandon Capital Partners v. Shelk*, 342 Or 555, 157 P3d 176 (2007) (*Crandon II*). Plaintiffs appeal the trial court's judgment denying attorney fees. In our first opinion, we held that the underlying dispute had become moot before the trial court addressed the asserted entitlement to fees, and that, therefore, the court lacked jurisdiction to enter such an award. The Supreme Court reversed that decision and remanded to us to address the merits of the parties' remaining contentions. For the reasons that follow, we reverse and remand.

Our previous opinion described the factual background for this dispute in some detail. We recite from it for convenience:

"This litigation arose from the proposed, and eventually completed, acquisition of Willamette Industries, Inc. (Willamette) by Weyerhaeuser Co. (Weyerhaeuser). Plaintiffs, Crandon Capital Partners (Crandon) and Rae Ann Brown (Brown), owned shares of Willamette.

"In November 2000, Weyerhaeuser offered to purchase all of Willamette's outstanding shares for $48 per share. That $48 offer was greater than the value of the stock at that time. Willamette rejected Weyerhaeuser's offer outright. On November 14, 2000, several days after Willamette's rejection, plaintiffs Crandon and Brown simultaneously filed derivative lawsuits on behalf of Willamette against the corporation and its directors.[1] Those two suits, which were filed in Multnomah County Circuit Court, were consolidated on December 20, 2000.

"In their first consolidated complaint, plaintiffs alleged claims for breach of fiduciary duty, abuse of control, and waste, all arising from Willamette's rejection of Weyerhaeuser's offer. Plaintiffs alleged that Willamette's directors refused to consider Weyerhaeuser's offer in good

---

[1] Willamette, as nominal defendant, is the only defendant remaining on appeal.

faith and that the directors used unlawful entrenchment measures (a series of 'golden parachutes' and 'poison pills' [described more fully below]) to deter Weyerhaeuser's potential acquisition. Plaintiffs' prayer for relief sought an injunction eliminating the alleged entrenchment measures, attorney fees, and damages.

"During the pendency of the litigation, Weyerhaeuser continued in its attempt to purchase Willamette. However, on December 10, 2001, Willamette announced that it was beginning its own negotiations with Georgia Pacific Corp. (GP) to purchase GP's building products division. Weyerhaeuser made it clear that the proposed deal with GP would render Willamette undesirable and that, if the transaction were completed, Weyerhaeuser would discontinue its efforts to acquire Willamette.

"Crandon and Brown regarded the potential GP transaction as a further entrenchment measure (a 'suicide pill') designed to thwart Weyerhaeuser's advances. Consequently, on December 18, 2001, plaintiffs filed a second amended complaint, which styled the proposed GP transaction as an unlawful entrenchment measure; plaintiffs again sought an injunction, attorney fees, and damages.

"On January 4, 2002, Willamette stockholder Wyser-Pratt Management Co. (Wyser-Pratt) filed a derivative complaint in Multnomah County Circuit Court. Like plaintiffs' second amended complaint, the Wyser-Pratt complaint was filed in response to the proposed GP transaction and also sought injunctive relief precluding such a transaction.

"Willamette moved to consolidate the Wyser-Pratt action with the previously filed Crandon and Brown actions. Wyser-Pratt moved for expedited discovery and a preliminary injunction to stop the GP acquisition. On January 16, 2002, the trial court heard arguments on both Willamette's motion to consolidate and Wyser-Pratt's motion for expedited discovery. Although attorneys for Crandon and Brown were present at the hearing, only attorneys for Wyser-Pratt presented argument. After ruling that the three actions would be consolidated, the court commented:

" '[I]t seems to me, from the plaintiffs' allegations, [that the GP acquisition is] something that would in fact—

affirmative steps, maybe not completed yet, but affirmative steps that would prevent the takeover and entrench the board.'

"After the court made those comments, but before the court rendered any ruling, Willamette's attorneys stipulated that Willamette would allow at least 48 hours between the time it announced an agreement with GP and the time it finalized that transaction. The 48-hour waiting period would allow plaintiffs and the court to review the final terms of any acquisition agreement.

"On January 21, 2002, Willamette accepted Weyerhaeuser's offer and agreed to sell at a price of $55.50. Thereafter, the tender price was paid out to the shareholders. Plaintiffs never sought to restrict or enjoin the distribution of any part of those funds as a possible source of the payment of attorney fees.

"On March 21, 2002, two months after Willamette accepted Weyerhaeuser's offer, plaintiffs filed a motion for an award of attorney fees. The gravamen of that motion was that plaintiffs were entitled to attorney fees because plaintiffs' efforts had 'force[d] defendants to comply with their fiduciary obligations to the Company and its shareholders and respond to Weyerhaeuser's offers in good faith.' Plaintiffs contended further:

> " 'Now, after 15 months of litigation, defendants have finally caved in, removed their improper defensive measures, agreed to a merger between Willamette and Weyerhaeuser, and abandoned a proposed acquisition by Willamette of the liability-ridden building products division of [GP]. By acquiescing to demands made by plaintiffs, defendants have conceded to plaintiffs' primary claims. Continued litigation of plaintiffs' claims is not necessary as plaintiffs have obtained the substantive relief they sought.' "

*Crandon I*, 202 Or App at 540-43 (footnotes omitted; some bracketed material in original).

At this point, it is necessary for us to diverge from the facts recounted in our earlier opinion to provide additional detail that is relevant to the issues before us on remand. In early March 2002, before plaintiffs filed their motion for an award of attorney fees, Willamette had filed a

motion to dismiss plaintiffs' second amended complaint. After plaintiffs filed their motion for attorney fees on March 21, and while Willamette's motion to dismiss the complaint was still pending, Willamette filed a response to plaintiffs' motion for fees, raising myriad objections.

The trial court denied plaintiffs' motion for attorney fees, determining that, under *Mulier v. Johnson*, 332 Or 344, 29 P3d 1104 (2001), plaintiffs' second amended complaint did not adequately allege a basis of entitlement to attorney fees, as prescribed in ORCP 68 C(2)(a). The court did not, however, rule on Willamette's pending motions to dismiss plaintiffs' second amended complaint.

Plaintiffs then moved, *inter alia*, for leave to file a supplemental complaint, pursuant to ORCP 23 E, to allege their entitlement to attorney fees. The trial court granted that motion over Willamette's objection. The court then granted Willamette's motion to dismiss plaintiffs' second amended complaint (because the substantive claims were moot), except "as to the claim for attorney fees under a catalyst theory." Plaintiffs subsequently filed what they styled as a "Third Amended Consolidated Complaint for Attorney Fees," in which the sole "claim for relief" was a claim for attorney fees under the theory that their conduct in filing the shareholder derivative actions had resulted in a benefit to Willamette and its shareholders by causing the Willamette board to abandon the GP deal, remove its entrenchment measures, and agree to sell the company to Weyerhaeuser at a favorable price. Plaintiffs later filed another statement of attorney fees.

Willamette responded by filing a motion for summary judgment against plaintiffs' third amended complaint, arguing that, under ORS 20.077, plaintiffs could not recover attorney fees because they had not prevailed on any claim for which attorney fees could be awarded. Alternatively, Willamette moved for partial summary judgment, arguing that plaintiffs were not entitled to recover attorney fees incurred after January 21, 2002, the date of the merger. Willamette also filed legal and factual objections to plaintiffs' statement of attorney fees.

After extensive briefing, the trial court denied Willamette's motion for summary judgment on the basis of ORS 20.077 but granted its motion for partial summary judgment. The court also directed the parties to submit supplemental briefing on the question whether plaintiffs were barred from recovering their attorney fees for litigating the case on the merits because they had failed to preserve, from the proceeds of the merger, a fund from which the fees could be paid.

On December 5, 2003, the trial court held a hearing on Willamette's legal objections to an award of attorney fees to plaintiffs based on "the absence of a common fund from which to pay an attorney fee award." As we related in our earlier opinion:

> "Ultimately, after reviewing voluminous submissions on fee entitlement in corporate derivative suits, with particular emphasis on Delaware case law addressing arguably analogous circumstances, the court determined that plaintiffs were not entitled to recover fees. That ruling rested on two principal premises: First, the primary benefit that plaintiffs had sought was enhancement of the price of Willamette shares, including through Willamette's acceptance of Weyerhaeuser's tender offer. Second, in derivative cases involving claims for attorney fees based on securing such a common pecuniary benefit, a plaintiff is required to enjoin the distribution of at least a portion of the tender price so as to segregate and maintain a fund from which fees can be paid by those who benefitted from the attorneys' efforts. That is, as an equitable matter, the benefitted shareholders of the acquired company—and not the shareholders of the acquiring company—should bear the cost of efforts that increased the buyout price. Because that prerequisite was not met here—the tender price had been fully disbursed—plaintiffs could not recover fees."

*Crandon I*, 202 Or App at 543. The court consequently denied plaintiffs' request for attorney fees and entered final judgment in favor of Willamette.

Plaintiffs appealed, asserting two assignments of error. They argued, first, that they were entitled to attorney fees under the "common benefit" doctrine and that the trial

court erred in concluding that they were barred from recovery due to the absence of a monetary fund from which those fees could be paid. In their second assignment of error, they challenged the trial court's grant of partial summary judgment in favor of Willamette on the question whether plaintiffs were entitled to recover for attorney fees incurred in preparing and litigating the fee petition (the so-called "fees on fees" question).

Willamette raised cross-assignments of error to four of the trial court's rulings. Specifically, Willamette contended that the trial court erred in determining that (1) the case was not moot; (2) plaintiffs were entitled to seek attorney fees even though they were not "prevailing" parties; and (3) plaintiffs had stated a claim for relief for attorney fees under the "common fund" or "substantial benefit" doctrine[2] before Willamette accepted Weyerhaeuser's tender offer. Willamette further argued that the court erred in allowing plaintiffs to replead their right to recover attorney fees after correctly denying their earlier request for attorney fees on the basis that their second amended complaint failed to comply with ORCP 68 C(2)(b).

We agreed with Willamette as to its first cross-assignment of error, concluding that plaintiffs' claims became moot when Weyerhaeuser acquired Willamette and, consequently, that the trial court lacked jurisdiction to adjudicate plaintiffs' request for attorney fees. *Crandon I*, 202 Or App at 548. As amplified below, the Supreme Court reversed that decision in *Crandon II*, and we now consider the parties' remaining assignments and cross-assignments of error.

We begin with plaintiffs' first assignment of error, which challenges the trial court's conclusion that plaintiffs were not entitled to attorney fees because they failed to segregate a common fund from which to award fees. In their supplemental brief on remand, plaintiffs assert that the Supreme Court's analysis and disposition in *Crandon II* necessarily, albeit implicitly, resolved that matter. We agree.

---

[2] Although Willamette refers to that concept as the "corporate benefit" or "common benefit" doctrine, we use the nomenclature adopted by the Supreme Court, *see Crandon II*, 342 Or at 562 n 4, and refer to it as the "substantial benefit" doctrine throughout this opinion.

As noted, in *Crandon II*, 342 Or at 569, the Supreme Court concluded that plaintiffs' claim for attorney fees survived after their substantive claims had become moot. That conclusion proceeded from the Supreme Court's determination that plaintiffs' attorney fee claim was based on the legal theory that "a court has the equitable power to award fees to a shareholder who brings litigation that confers a benefit on a corporation or on all of the corporation's shareholders." *Id.* at 562. The court first noted that that theory—which it referred to as the "substantial benefit" test—had previously been recognized in Oregon, citing *Krause v. Mason*, 272 Or 351, 537 P2d 105 (1975), and *Gilbert v. Hoisting & Port. Engrs.*, 237 Or 130, 384 P2d 136 (1963), *cert den*, 376 US 963 (1964). *Crandon II*, 342 Or at 562-63. The Supreme Court distinguished the "substantial benefit" test from the "related but distinct 'common fund' theory":

> "The equitable basis for plaintiffs' attorney fee claim often is described as the 'substantial benefit' test, and we use that phrase because it is consistent with the words used by this court when it awarded attorney fees to the plaintiff-shareholder in *Krause*. The parties here, and some courts, refer to that equitable theory as the 'common benefit' or 'corporate benefit' theory. Those terms, however, are less appropriate than 'substantial benefit' because the term 'common benefit' is easily confused with the related but distinct 'common fund' theory for awarding attorney fees[.]"

*Crandon II*, 342 Or at 562 n 4. Under the common fund doctrine, "plaintiffs whose legal efforts create, discover, increase, or preserve a fund of money to which others also have a claim, may recover the costs of their litigation, including their attorney fees, from the created or preserved fund." *Id.* at 566 (quoting *Strunk v. PERB,* 341 Or 175, 181, 139 P3d 956 (2006)).

Conversely, the substantial benefit doctrine originated in the idea that fees may be awarded even in the absence of a fund. *Crandon II*, 342 Or at 566. Tracing the development of that doctrine in Oregon, the Supreme Court observed that the equitable rationale for awarding fees under either the substantial benefit theory or the common fund theory—that is, that "fees are awarded not as in a 'prevailing party' case, to make the plaintiff whole by shifting all costs to

the wrongdoer, but instead to spread the costs among those on whose behalf the case was brought and who benefitted from the plaintiff's efforts"—was expressly adopted by the court in *Gilbert. Id.* Then, as the court explained, in *Krause,* it relied upon *Gilbert,* as well as various treatises and cases from other jurisdictions, to affirm an award of attorney fees to the plaintiffs in a shareholder derivative action "based on the financial benefit that the plaintiffs' litigation had conferred on the corporation and its other shareholders, *even though that litigation did not result in a common fund from which those fees could be paid." Crandon II,* 342 Or at 567 (emphasis added).

Against that backdrop, the Supreme Court in *Crandon II* then concluded that plaintiffs' claim for attorney fees "on the equitable ground that its actions conferred a *substantial benefit* on Willamette and its shareholders did not become moot simply because plaintiffs' substantive claims had become moot" and, consequently, the claim for attorney fees was justiciable.[3] *Id.* at 569 (emphasis added). The trial court's determination that plaintiffs' attorney fee claim was dependent on the preservation of a common fund from which the fees could be paid is irreconcilable with the substantial benefit doctrine predicate of *Crandon II*'s holding.[4]

In sum, the Supreme Court's analysis and disposition in *Crandon II* compels a remand to the trial court unless

---

[3] Although the mootness issue was not presented in *Krause* and *Gilbert,* the court in *Crandon II* reasoned that its decision was consistent with the rationale underlying those cases, as well as with other courts that had considered the issue and the authorities upon which it relied in awarding fees in *Krause. Crandon II,* 342 Or at 565-69.

[4] Willamette asserts that, because any benefit from the litigation did not flow to Willamette as a corporation, but was, instead, distributed to Willamette's former shareholders when they were cashed out, the trial court was nevertheless correct in concluding that plaintiffs could not recover attorney fees because they "failed to take any steps to spread their fees among the *benefitted* shareholders." (Emphasis added.) That position, however, is functionally dependent on casting plaintiffs' claim as derived from the "common fund" theory of recovery—a characterization that the Supreme Court rejected in *Crandon II.*

We note, further, that the record in this case is, as yet, insufficiently developed to assess the equities of, in effect, requiring Weyerhaeuser, as the ultimately successful hostile bidder and Willamette's successor in interest, to assume some or all of the fees incurred in securing a corporate benefit for Willamette. *See First Interstate Bancorp Shareholder,* 756 A2d 353 (Del Ch 1999), *aff'd,* 755 A2d 388 (Del 2000) (addressing concept).

Willamette succeeds on any of its remaining cross-assignments of error. We address each in turn.

■ In its second cross-assignment, Willamette asserts that the trial court erred in rejecting Willamette's argument that plaintiffs were precluded from recovering attorney fees because they had not been "prevailing parties" in the underlying litigation. *Crandon II* is dispositive of that contention. Specifically, the Supreme Court concluded there that an award of fees under the substantial benefit theory is distinct from those awarded in a "prevailing party" case and that a plaintiff in a shareholder derivative action may recover attorney fees under the substantial benefit theory even if the plaintiff has not obtained a judgment in its favor on the merits. *Crandon II*, 342 Or at 569.

We turn to Willamette's third cross-assignment of error, which challenges the trial court's conclusion that plaintiffs had properly stated a claim for relief for attorney fees under the substantial benefit doctrine. In recognizing that a plaintiff in a derivative action may be entitled to attorney fees under the substantial benefit doctrine even though the action is not pursued to final judgment, the Supreme Court in *Crandon II* relied on shareholder derivative cases from other jurisdictions, particularly Delaware, and various corporation law treatises. 342 Or at 567-68. Thus, it is appropriate for us to also look to those sources to guide us in determining the contours of such a claim.

It is well settled under Delaware law that to be entitled to fees under the substantial benefit doctrine, a party must demonstrate, as a preliminary matter, that "(1) the suit was meritorious when filed; (2) the action producing benefit to the corporation was taken by the defendants before a judicial resolution was achieved; and (3) the resulting corporate benefit was causally related to the lawsuit." *United Vanguard Fund v. TakeCare, Inc.*, 693 A2d 1076, 1079 (Del 1997) (cited with approval in *Crandon II*, 342 Or at 567-68). As the Delaware Supreme Court has explained:

> "The reason for allowing an award of attorneys' fees to plaintiff's counsel where a defendant corporation takes steps to settle or moot a case and in so doing produces the

same or similar benefit sought by the shareholder's litigation is to prevent frustration of the remedial policy of providing professional compensation for such suits when meritorious. This rule insures that, even without a favorable adjudication, counsel will be compensated for the beneficial results they produced, provided that the action was meritorious and had a causal connection to the conferred benefit."

*Allied Artists Pictures Corp. v. Baron,* 413 A2d 876, 878 (Del 1980) (citations omitted).

■■■ The meaning of the "meritoriousness" requirement was fully explored in *Chrysler Corporation v. Dann,* 223 A2d 384 (Del 1966). There the court observed that to allow the award of fees upon the mere filing of a derivative action would encourage the filing of many baseless actions solely for the purpose of obtaining counsel fees—a clearly undesirable result. *Id.* at 386-87. Rather, to justify an award of fees,

"the action in which they are sought must have had merit at the time it was filed. It may not be a series of unjustified and unprovable charges of wrongdoing to the disadvantage of the corporation. The plaintiff must have some factual basis at least for the making of the charges."

*Id.* at 387. On the other hand, the court expressly rejected the notion that the rule was so demanding as to require that the action, to be meritorious, must be capable of surviving a motion for summary judgment. *Id.* Rather, the court concluded:

"A claim is meritorious within the meaning of the rule if it can withstand a motion to dismiss on the pleadings if, at the same time, the plaintiff possesses knowledge of provable facts which hold out some reasonable likelihood of ultimate success. It is not necessary that factually there be absolute assurance of ultimate success, but only that there be some reasonable hope."

*Id.*; *see also Kahan v. Rosenstiel,* 424 F2d 161, 167 (3d Cir), *cert den,* 398 US 950 (1970) (noting that "[i]n several cases which became moot, courts have said suits were 'meritorious' if they could have survived a motion to dismiss"). We agree with the rationale expressed by the Delaware court and adopt its standard for determining the "meritoriousness" of

the predicate litigation as applicable to "substantial benefit"-based attorney fee claims in Oregon.

Willamette contends that plaintiffs' complaint was not meritorious—that is, that it would not survive a motion to dismiss on the pleadings—because plaintiffs, before bringing their action, failed to comply with the demand requirements of ORS 60.261(2).[5] Plaintiffs counter that they adequately pleaded futility of demand and, thus, demand was excused under the statute.

ORS 60.261(2) provides, in part:

> "A complaint in a proceeding brought in the right of a corporation must allege with particularity the demand made, if any, to obtain action by the board of directors and either that the demand was refused or ignored or why a demand was not made."[6]

That provision has not previously been construed in Oregon. However, Delaware, which has an analogous pleading rule, *see* Delaware Chancery Court Rule 23.1(a), has a body of law addressing its application.[7] The Delaware Supreme Court has explained the rationale for the demand requirement as follows:

---

[5] Willamette does not contend that plaintiffs' complaint was nonmeritorious in any other regard.

[6] ORS 60.261(2) was enacted in 1987 as part of the revised Oregon Business Corporation Act. Or Laws 1987, ch 52, § 67. It adopted, without substantive change, what was then section 7.40 of the Revised Model Business Corporation Act (1984). Oregon State Bar Business Law Section, Model Business Corporation Act Task Force, *Report on Oregon Revised Model Business Corporation Act* (Mar 24, 1987), § 67, p 33 ("Subsection (2) requires that the complaint allege a demand on the corporation prior to instituting litigation or explain why no demand was made.").

[7] Delaware Chancery Court Rule 23.1(a) provides, in part:

"The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort."

FRCP 23.1 is similar. It provides, in part, that the complaint must "state with particularity" "any effort by the plaintiff to obtain the desired action from the directors or comparable authority * * *" and "the reasons for not obtaining the action or not making the effort." *See also* Thomas P. Kinney, *Stockholder Derivative Suits: Demand and Futility Where the Board Fails to Stop Wrongdoers*, 78 Marq L Rev 172 (1994).

> "By its very nature, the derivative action impinges on the managerial freedom of directors. Hence, the demand requirement of Chancery Rule 23.1 exists at the threshold, first to insure that a stockholder exhausts his intracorporate remedies, and then to provide a safeguard against strike suits. Thus, by promoting this form of alternative dispute resolution, rather than immediate recourse to litigation, the demand requirement is a recognition of the fundamental precept that directors manage the business and affairs of corporations."

*Aronson v. Lewis*, 473 A2d 805, 811-12 (Del 1984), *overruled in part on other grounds by Brehm v. Eisner*, 746 A2d 244, 254 (Del 2000) (footnotes omitted).[8]

■ To excuse noncompliance with the prelitigation demand requirement, a plaintiff must be able to articulate particularized facts showing that there is a reasonable doubt either that (1) the directors are disinterested and independent for purposes of responding to the demand or (2) the challenged transaction was otherwise the product of a valid exercise of business judgment. If either prong is satisfied, demand is excused. *Brehm*, 746 A2d at 256 (citing *Aronson*, 473 A2d at 814); *see also* Jennifer L. Berger, Amy M. Hurwitz, Carol A. Jones, 13 *Fletcher Cyclopedia of the Law of Private Corporations* § 5965, 79, 79 n 15 (rev ed 2004) (so stating; citing federal and state cases applying Delaware law). In *Brehm*, the court explained:

> "The rationale of Rule 23.1 is two-fold. On the one hand, it would allow a plaintiff to proceed with discovery and trial if the plaintiff complies with this rule and can articulate a reasonable basis to be entrusted with a claim that belongs to the corporation. On the other hand, the rule does not permit a stockholder to cause the corporation to expend money and resources in discovery and trial in the stockholder's quixotic pursuit of a purported corporate claim based solely on conclusions, opinions or speculations."

746 A2d at 255.

---

[8] In Oregon, as in many jurisdictions, the "fundamental precept" that *Aronson* references is embodied in statute. ORS 60.301(2) provides, in part: "All corporate powers shall be exercised by or under the authority of, and the business and affairs of the corporation managed under the direction of, the board of directors[.]"

■■■ The parties here focus on the second prong of the *Aronson* test—that is, whether plaintiffs alleged facts sufficient to create a reasonable doubt that the board's actions were protected by the business judgment rule, thus excusing plaintiffs from making a demand on the board. The business judgment rule is a "presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Aronson*, 473 A2d at 812. "A hallmark of the business judgment rule is that a court will not substitute its judgment for that of the board if the latter's decision can be attributed to *any rational business purpose*." *Unocal Corp. v. Mesa Petroleum Co.*, 493 A2d 946, 954 (Del 1985) (*Unocal*) (internal quotation marks omitted; emphasis added). The business judgment rule generally operates to bar judicial inquiry into actions of corporate directors taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes. Thus, as a general matter, a party seeking to avoid the prelitigation demand requirement must plead facts sufficient to rebut the business judgment rule presumption. *Growbow v. Perot*, 539 A2d 180, 186-87 (Del 1988), *overruled in part on other grounds by Brehm*, 746 A2d at 254.

■■ ■■ In *Unocal*, however, the Delaware Supreme Court recognized that, where a board has enacted defensive measures in response to a takeover bid, an inherent conflict is created between the possible self-interest of the directors to remain in office and the welfare of the corporation and its shareholders. 493 A2d at 954. In that context, a board's duty is "enhanced" by the "omnipresent specter that a board may be acting primarily in its own interests, rather than those of the corporation and its shareholders." *Id.* That enhanced duty triggers heightened judicial scrutiny, that is, "judicial examination at the threshold *before the protections of the business judgment rule may be conferred.*" *Id.* (emphasis added). In other words, the board's actions in employing the defensive mechanisms will not be upheld merely on the basis that some rational business purpose would be served. Rather, if the plaintiff has alleged particularized facts that "a board unilaterally (*i.e.*, without stockholder approval) adopts defensive measures in reaction to a perceived threat," the

protection of the business judgment rule does not automatically attach—instead, the burden shifts to the board to establish the reasonableness of their actions.[9] *Williams v. Geier*, 671 A2d 1368, 1377, 1377 n 18 (Del 1996) (citing *Unocal*, 493 A2d at 954-55).

■    To warrant application of *Unocal*, the complaint must fairly allege that a board of directors unilaterally initiated defensive actions "in response to a threat to corporate policy related to a potential change in control of the corporation." *Kahn v. Roberts*, 679 A2d 460, 465-66 (Del 1996) (board's decision to approve repurchase of corporate shares, when there was no hostile bidder nor other indication that the corporation was " 'in play,' " "was not the type of response to a threat to corporate control which implicates the concerns of entrenchment and conflict requiring heightened judicial scrutiny"); *see also* Dennis J. Block, Nancy E. Barton, Stephen A. Radin, 1 *The Business Judgment Rule* 649 (5th ed 1998) ("A threshold issue that must be resolved before the analysis required by *Unocal* * * * may be undertaken is whether board conduct is defensive in nature." (Footnote omitted.)). We concur in the analysis of the Delaware court and conclude that heightened judicial scrutiny, rather than simple application of the business judgment rule, is appropriate where a board of directors has unilaterally taken defensive measures in response to a pending or potential bid for corporate control.[10]

---

[9] In meeting that burden, the board must show that (1) it had reasonable grounds for believing that a danger to corporate policy and effectiveness existed and (2) the defensive response was reasonable in relation to the threat posed. *Unitrin, Inc. v. American General Corp.*, 651 A2d 1361, 1373 (Del 1995).

[10] We note that, in *Kahn v. Sprouse*, 842 F Supp 423, 426-27 (D Or 1993), the federal district court for the District of Oregon assumed the applicability of the *Unocal* standard under Oregon law, but held that it was not triggered where the plaintiffs had failed to identify any defensive measures adopted by the board but alleged only that it had rejected merger proposals. The court noted that "saying 'no' to a merger proposal is a far cry from adopting defensive measures designed to impede or defeat a change in control of the company."

The *Unocal* standard has also been held to apply by courts construing the law of other states. *See International Ins. Co. v. Johns*, 874 F2d 1447, 1458-59 (11th Cir 1989) (applying *Unocal* standard under Florida law); *Plaza Securities Co. v. Fruehauf Corp.*, 643 F Supp 1535, 1543 n 6 (ED Mich 1986) (same under Michigan law); *Gelco Corp. v. Coniston Partners*, 652 F Supp 829, 845 (D Minn 1986), *aff'd in part and vac'd in part on other grounds*, 811 F2d 414 (8th Cir 1987) (same under

■ Once the enhanced judicial scrutiny of *Unocal* is triggered, it follows that, for purposes of surviving a motion to dismiss, demand generally will be excused. That is so because the burden then shifts to the board to satisfy the court that its actions were reasonable; thus, the inquiry is necessarily fact-driven and requires a factual record not before the court on a motion to dismiss. *See In re Santa Fe Pac. Corp. Shareholder Lit.*, 669 A2d 59, 72 (Del 1995) ("As the terminology of enhanced judicial scrutiny implies, boards can expect to be required to justify their decisionmaking, within a range of reasonableness, when they adopt defensive measures with implications for corporate control. This scrutiny will usually not be satisfied by resting on a defense motion merely attacking the pleadings."); *see also* Block, 1 *The Business Judgment Rule* at 1115 (quoting *In re Sante Fe*, 669 A2d at 72, for the proposition that, because the board then has the burden of going forward with the evidence, "it is 'difficult[ ] [to] expeditiously dispens[e] with claims seeking enhanced scrutiny at the pleading state where the complaint is not completely conclusory" (brackets in original)).

■ It is unsurprising, given *Unocal*'s rigors, that the parties' dispute with respect to the third cross-assignment of error focuses on whether the heightened judicial scrutiny prescribed by *Unocal* is triggered in this case. Plaintiffs argue that it is, because their pleading alleges sufficient facts to raise the presumption that the board took affirmative measures to entrench themselves in office in response to Weyerhaeuser's takeover attempt.

---

Minnesota law); *AHI Metnall v. J.C. Nichols Co.*, 891 F Supp 1352, 1356 (WD Mo 1995) (same under Missouri law); *Hilton Hotels Corp. v. ITT Corp.*, 978 F Supp 1342, 1346 (D Nev 1997) (same under Nevada law); *International Banknote Co., Inc. v. Muller*, 713 F Supp 612, 626 (SDNY 1989) (same under New York law); *Amanda Acquisition Corp. v. Universal Foods Corp.*, 708 F Supp 984, 1009 (ED Wis), *aff'd*, 877 F2d 496 (7th Cir), *cert den*, 493 US 955 (1989) (same under Wisconsin law); *see also NCR Corp. v. American Tel. and Tel. Co.*, 761 F Supp 475, 499 (SD Ohio 1991) (noting that, although Maryland law was dispositive, same result would be reached applying *Unocal*); *Weiboldt Stores, Inc. v. Schottenstein*, 94 Bankruptcy Reporter 488, 509-10 (ND Ill 1988) (*Unocal* cited approvingly in construing Illinois corporation law).

Other states have rejected the heightened scrutiny standard of *Unocal* by statute. *See* Ind Code § 23-1-35-1(f); NJ Stat Ann § 14A:6-1(3); NC Gen Stat § 55-8-30(d); Ohio Rev Code Ann § 1701.59(C)(1); 15 Pa Cons Stat Ann §§ 1715(d), 515(d); Va Code Ann §§ 13.1-728.9, 13.1-690.

Willamette counters that *Unocal* does not apply in this case because plaintiffs' complaint does not allege with sufficient particularity that the board adopted defensive measures in response to Weyerhaeuser's tender offer. In Willamette's view, none of the events identified in plaintiffs' complaint would amount to a defensive measure triggering *Unocal* scrutiny. Consequently, Willamette contends, it is entitled to the ordinary presumption of the business judgment rule and, because plaintiffs failed to plead facts overcoming that presumption, they failed to adequately plead demand futility under ORS 60.261(2). That, in turn, would mean that plaintiffs' claims were not "meritorious when filed," *United Vanguard Fund*, 693 A2d at 1079, precluding recovery of attorney fees under the substantial benefit doctrine.

We turn to the allegations in plaintiffs' complaint. As an initial matter, we agree with the parties' assumption that it is the second amended complaint—because it was the operative complaint at the time that plaintiffs' substantive claims became moot—that is the proper pleading for us to consider in determining whether plaintiffs' claims are "meritorious."[11] Additionally, because we must view the complaint as if it were the subject of a motion to dismiss for failure to state a claim, we accept as true all well-pleaded allegations in the complaint and give the plaintiff the benefit of all favorable inferences that may be drawn from the facts alleged. *See Granewich v. Harding*, 329 Or 47, 51, 985 P2d 788 (1999);

---

[11] Plaintiffs' third amended complaint was filed *after* Willamette took the actions that mooted plaintiffs' substantive claims and allegedly resulted in "substantial benefit" to Willamette; thus, there can be no "causal relationship" between that complaint and Willamette's actions. *Cf. Allied Artists Pictures Corp.*, 413 A2d at 879 (fees allowed under substantial benefit theory where, *at the time of mooting on appeal,* the plaintiff's contentions were still capable of producing the effect intended by filing the suit).

Although the second amended complaint is the temporally operative pleading for purposes of assessing whether plaintiffs' substantive claims were "meritorious" for purposes of the substantial benefit doctrine, the trial court, as noted, determined that that complaint did not satisfy the requisites of ORCP 68 C(2)(a). *See* 219 Or App at 22. The propriety of the trial court's ruling allowing plaintiffs to subsequently file their third amended complaint, which did satisfy those requirements, is the subject of Willamette's fourth cross-assignment of error, which we address below. *See* 219 Or App at 38-41.

*Kilminster v. Day Management Corp.*, 323 Or 618, 621, 919 P2d 474 (1996).

Plaintiffs' argument that its second amended complaint adequately pleaded defensive measures sufficient to excuse demand under *Unocal* is based primarily on its allegations relating to the following actions of the Willamette board: (1) "implementing" the shareholders' rights plan (the "poison pill"); (2) adopting and expanding severance packages (the "golden parachutes"); and (3) attempting to cause Willamette to acquire GP's building products division. For the reasons discussed below, we conclude that the factual allegations of plaintiffs' complaint are sufficient—considered collectively—to demonstrate that the board's conduct was defensive in nature, thus triggering *Unocal* and excusing demand under ORS 60.261(2).

We begin with plaintiffs' allegations regarding the "poison pill." That term refers to a mechanism under which,

> "[u]pon the occurrence of certain 'triggering' events, such as a would-be acquiror's purchase of a certain percentage of the target corporation's shares, or the announcement of a tender offer, all existing stockholders, except for the would-be acquiror, get the right to purchase debt or stock of the target at a discount. This action dilutes the would-be acquiror's stake in the company and increases the costs of acquisition."

*Unitrin*, 651 A2d at 1369 n 6 (citing Robert J. Klein, *The Case for Heightened Scrutiny in Defense of the Shareholder's Franchise Right*, 44 Stan L Rev 129, 129 n 6 (1991)). Consummation of an unsanctioned tender offer thus becomes "prohibitively expensive until such time as the rights are redeemed." Block, 1 *The Business Judgment Rule* at 1089 (internal quotation marks and footnote omitted). "The primary purpose of a poison pill is to enable the board of directors of a target corporation to prevent the acquisition of a majority of the company's stock through an inadequate or coercive tender offer, while giving the board leverage to negotiate with potential acquirers." *Corporations*, 19 Am Jur 2d 298 § 2186 (2004).

Here, plaintiffs' complaint includes several general allegations regarding Willamette's poison pill—for example,

that the board "attempted to entrench themselves as managers and directors of the Company by implementing Willamette's shareholder rights plan * * * in response to the Weyerhaeuser offers and in order to block and frustrate Weyerhaeuser's bid" and that "[t]he purpose and intent of the implementation and retention of the Poison Pill is to prevent any acquisition of Willamette by tender or otherwise by any person who does not obtain the blessing of defendants." Those allegations, however, are purely conclusory. *See Brehm,* 746 A2d at 254 ("Rule 23.1 is not satisfied by conclusory statements or mere notice pleading"; rather the "pleader must set forth particularized factual statements that are essential to the claim").

Plaintiffs' only particularized allegation regarding the poison pill is that, "as of December 1, 2000, the Willamette board adopted a resolution deferring the Distribution Date of the Rights * * * as a result of the commencement of the Weyerhaeuser offer, until such later date as the board may substantially determine by resolution." Thus, plaintiffs do not allege that the poison pill was *adopted* in reaction to the announcement of Weyerhaeuser's tender offer, but only that the board acted to defer its distribution date. The complaint asserts that the poison pill is triggered

"if and when (i) 10 days following a public announcement that * * * an 'Acquiring Person' * * * acquired, or obtained the right to acquire, beneficial ownership of 15% or more of the outstanding shares of Common Stock; and (ii) 10 business days (or such later date as may be determined by action of the Board of Directors) following the commencement of * * * a tender offer or exchange offer (other than a Sanctioned Tender Offer) the consummation of which would result in the beneficial ownership by a person or group of 15% or more of the outstanding shares of Common Stock."

Accordingly, if the board had *not* deferred the distribution date, it appears that the poison pill would have been triggered by Weyerhaeuser's tender offer. In other words, the board's conduct in deferring the distribution date of the poison pill actually stopped it from taking effect and effectively terminating Weyerhaeuser's tender offer. Thus, the upshot of plaintiffs' allegation is that the board took action enabling it

to consider Weyerhaeuser's offer in the future. That action—*standing alone*—is insufficient to implicate the entrenchment concerns of *Unocal*.

However, plaintiffs' second amended complaint also alleged that, four days after the board deferred distribution of the poison pill—and just six days after Weyerhaeuser took its tender offer to Willamette's shareholders—the board also adopted a "golden parachute" program.[12] Specifically, the complaint details a series of agreements that the Willamette board entered into, beginning on December 5, 2000, and continuing through December 21, 2000, to provide severance pay and other benefits to various employees in the event their employment was terminated within a specified time after a change in control of the corporation. The "parachutes" covered key executives and top managers, as well as other salaried employees. The agreements also provided for an additional payment—known as a "gross-up" payment—to relieve employees from any excise tax obligations that would arise from the "parachute" payments. The complaint alleged that, as a result of the expansive nature of the golden parachutes and the particular manner in which they are triggered, it is "highly likely that the Employees covered by these Agreements will be entitled to exercise these rights" and that, consequently, any entity purchasing Willamette would be subject to a cost of $60 million to buy out those employees or otherwise defend against lawsuits initiated by them. Those allegations describe facts—particularly with respect to the timing of the board's adoption of the golden parachutes and the expansiveness of those provisions—to demonstrate that Willamette's board was operating in a defensive mode in response to Weyerhaeuser's efforts to take over the company.

Finally, plaintiffs' allegations regarding the board's attempt to enter into a business arrangement with a division

---

[12] As we noted in *Crandon I*, " '[a] golden parachute is a contractual arrangement between [a corporation] and one or more executive officers whereby the [corporation] promises to provide the executive with substantial benefits over and above those the executive would normally receive if the officer is terminated as a result of a change in corporate control.' Carol Goforth, *Proxy Reform as a Means of Increasing Shareholder Participation in Corporate Governance: Too Little, But Not Too Late*, 43 Am U L Rev 379, 424 n 271 (1994)." 202 Or App at 541 n 2 (bracketed material in original).

of GP corroborate the sufficiency of plaintiffs' allegations pertaining to the golden parachutes with respect to the "defensive" nature of the board's conduct. The second amended complaint alleged that "defendants attempted to irreparably impair Willamette's operations by entering into a business combination which will increase Willamette's debt to equity retained by at least 50% and will subject Willamette to billions of dollars of potential asbestos related liability." It also alleged that Willamette was "in negotiations with [GP] regarding a possible combination of Willamette with the building-products business of [GP]" and that "takeover experts believe that 'a deal in certain forms could create tax issues that would be unappealing for Weyerhaeuser.'" The complaint further alleged that Rogel, president and chief executive officer of Weyerhaeuser, sent a letter to Willamette's chairman of the board and its president and chief executive officer, informing them that he had "heard from 'credible sources that Willamette is actively considering a significant acquisition'" and "strongly encouraging [them] not to enter into a transaction that would damage your shareholders' value or otherwise preclude a combination with Weyerhaeuser." Those statements—accepted as true and giving plaintiffs the benefit of all reasonable inferences to be drawn from them—are adequate to plead that Willamette's proposed transaction with GP was initiated as a "defensive acquisition" in an effort to make the company less attractive to Weyerhaeuser.

In sum, we conclude that, viewed in their totality, plaintiffs' allegations regarding the Willamette board's use of the poison pill, its adoption of a bevy of golden parachutes, and its attempted deal with GP sufficiently describe a pattern of defensive conduct initiated in response to Weyerhaeuser's tender offer. Under *Unocal*, those allegations are sufficient to raise a "reasonable doubt that the challenged transaction was otherwise the product of a valid exercise of business judgment," *Brehm*, 746 A2d at 256 (internal quotation marks omitted), excusing plaintiffs' noncompliance with the prelitigation demand requirement of ORS 60.261(2). Consequently, the trial court correctly concluded that plaintiffs' pleadings were sufficient to satisfy the first, "meritorious suit" element of the substantial benefit doctrine. *See* 219 Or App at 27-29.

We thus reject Willamette's third cross-assignment of error challenging that ruling.

We proceed to Willamette's fourth cross-assignment of error, which asserts that the trial court erred "in refusing to enter judgment in favor of defendants after it denied plaintiffs' request for attorney fees." The gist of Willamette's argument, as we understand it, is that, once the trial court ruled that plaintiffs' second amended complaint failed to sufficiently allege the basis of entitlement to attorney fees, as required by ORCP 68 C(2)(a), the case was over—and the only procedurally available and appropriate course was for the trial court to enter a judgment of dismissal. Given that, Willamette reasons, the trial court had no discretion to allow plaintiffs leave to supplement their pleadings so as to remedy the deficiency under ORCP 68 C(2)(a).

The fundamental flaw in Willamette's position is that the case was not over. Although the trial court had ruled that plaintiffs' then-extant second amended complaint did not sufficiently plead an entitlement to attorney fees, the court had not yet ruled on Willamette's pending motion to dismiss the derivative claims pleaded in that complaint— claims that sought not only attorney fees but also damages and injunctive relief. *See* 219 Or App at 21-22 (describing procedural history). Thus, at the time the trial court granted plaintiffs' motion to supplement, plaintiffs' substantive claims against Willamette were still pending before the court.

That circumstance dispositively distinguishes this case from *Mulier*, the sole authority that Willamette invokes as support for its contention that the trial court erred in allowing plaintiffs to file their supplemental third amended complaint. In *Mulier*, the defendants moved for summary judgment and, in a memorandum of law supporting the summary judgment motion, but not in the motion itself, the defendants alleged a right to recover attorney fees. The trial court allowed summary judgment and awarded attorney fees. On appeal, we rejected the plaintiff's challenge to the fee award. *Mulier v. Johnson*, 163 Or App 42, 986 P2d 742 (1999), *rev'd on other grounds*, 332 Or 344, 29 P3d 1104 (2001). Specifically, we held that the defendants were not

precluded, due to noncompliance with ORCP 68 C(2)(b), from recovering fees with respect to one of their claims—the "statutory duty" claim—in part because the memorandum of law served the purposes of ORCP 68 with respect to that claim. 163 Or App at 47-49. In remanding the case for the trial court to consider the plaintiff's objections to those fees, we also stated,

"contrary to defendants' assertions, on remand the trial court would not 'have discretion to allow defendants, if necessary, to amend their motion for summary judgment' to allege an entitlement to fees associated with the section 1983 claims. Defendants' motion for summary judgment has been fully adjudicated and, thus, is not susceptible to 'amendment.' "

*Id.* at 47.

Of course, given that our opinion was subsequently reversed by the Supreme Court in *Mulier*, our *dictum* as to the proper scope of remand there was ephemeral. Beyond that, however, the predicate for our observation there does not exist here. In *Mulier*, the trial court had conclusively—by way of summary judgment—finally disposed of the plaintiff's substantive claims, and we had affirmed that disposition on appeal. Consequently, there truly was "nothing left for the court to do" with respect to the merits of the plaintiff's claims. Here, in contrast, plaintiffs' substantive claims against Willamette remained pending at the time that plaintiffs requested leave to supplement their complaint. Those claims had not been "fully adjudicated."

As we have previously held, trial courts have broad discretion under ORCP 23 in determining whether to allow a party to amend or supplement a pleading, *McAmis Industries v. M. Cutter Co.*, 161 Or App 631, 636, 984 P2d 909, *rev den*, 329 Or 553 (1999); *Hall v. Fox*, 106 Or App 377, 380, 808 P2d 99 (1991); *Benj. Franklin Fed. Savings and Loan v. Phillips*, 88 Or App 354, 357, 745 P2d 437 (1987), and we review only for abuse of that discretion. *Id.* In *Benj. Franklin Fed. Savings and Loan*, we noted that, "[a]lthough ORCP 68C clearly states that the right to attorney fees shall be asserted in a pleading, there is nothing in the rule to suggest that an amendment to comply with the rule is precluded." *Id.* We

then held that the trial court's discretion under ORCP 23 A extends to a motion to amend a pleading to assert an entitlement to attorney fees under ORCP 68 C where the amendment is allowed before entry of final judgment and the defendant has not been prejudiced. *Id.*

Likewise, in *Hall*, we affirmed the trial court's grant of the plaintiff's motion to amend her complaint *after trial* to plead an entitlement to attorney fees, concluding that, because the defendant had not been prejudiced as he claimed, the trial court did not abuse its discretion in allowing the amendment. 106 Or App at 380. *Cf. Wiper v. Fawkes*, 198 Or App 331, 336-37, 109 P3d 798 (2005) ("Neither ORCP 68 C(2) nor our cases establish that a party must assert a right to recover attorney fees at the first appropriate opportunity in order to be entitled to recover fees.").

The trial court's allowance of leave to supplement in this case was well within the bounds of discretion as described in *Hall* and *Benj. Franklin Fed. Savings and Loan*. Further, Willamette does not—and cannot plausibly—claim to have been prejudiced by the allowance of the supplemental complaint because of some lack of notice that plaintiffs were seeking attorney fees. Accordingly, we reject Willamette's fourth cross-assignment of error.

We pause—and briefly recapitulate: We have, based largely on *Crandon II*, concluded that the trial court erred, in its stated grounds, in holding that plaintiffs were precluded from recovering attorney fees. We have further rejected each of Willamette's three remaining cross-assignments of error, any of which would, independently, have compelled affirmance. Thus, we reverse and remand for the trial court to consider unresolved matters pertaining to plaintiffs' asserted entitlement to fees under the substantial benefit theory, including, without limitation, whether "the action producing benefit to the corporation was taken by the defendants before a judicial resolution was achieved" and whether "the resulting corporate benefit was causally related to the lawsuit." *United Vanguard Fund*, 693 A2d at 1079.

One matter remains, which, for the sake of cogent discussion and disposition, we have deferred to the last. In their second assignment of error, plaintiffs challenge the trial

court's allowance of partial summary judgment in favor of Willamette with respect to plaintiffs' asserted entitlement to recover "fees on fees." Plaintiffs argue that it is well settled in Oregon that a party may recover its attorney fees incurred as part of fee litigation and that the trial court erred in abandoning that precedent and ruling that they could not, as a matter of Delaware law, recover those fees.

Willamette counters that, because plaintiffs premised their primary attorney fee request on the Delaware substantial benefit doctrine, they cannot now reasonably contend that the court erred in applying Delaware law with respect to the derivative "fees on fees." According to Willamette, fees incurred after the date that a tender offer is accepted (or other sought after corporate change takes place) are not recoverable under Delaware law, with the rationale being that fees incurred after that date are for the benefit of counsel, rather than for the benefit of the shareholders of the corporation. While acknowledging that Oregon courts generally permit the recovery of fees on fees when a statute or contract provides for prevailing party attorney fees, Willamette also points out that no Oregon court has extended that concept to fee recovery under the substantial benefit doctrine.

We conclude that plaintiffs have the better argument. As plaintiffs emphasize, there is longstanding precedent in Oregon that a party may recover its attorney fees incurred as part of the fee application and litigation process. In *Johnson v. Jeppe*, 77 Or App 685, 688, 713 P2d 1090 (1986), recognizing that ORCP 68 is the governing mechanism for awarding attorney fees "pursuant to contract and to most statutes," we held that "[t]he enforcement of a judgment and final collection of money due are 'legal services related to the prosecution or defense of an action' [as provided in ORCP 68 A(1)] and may be considered in awarding attorney fees." Later, in *Emerald PUD v. Pacificorp*, 104 Or App 504, 507, 801 P2d 141 (1990), *rev den*, 311 Or 222 (1991), we relied on *Johnson* to reject the plaintiff's argument that the trial court's award of " 'fees for recovering fees' was not permissible, because the process of recovering fees is not part of the 'prosecution of an action' " for purposes of ORCP 68. We explained that, like enforcement of a judgment, the recovery

of attorney fees to which a prevailing party is entitled by statute is "related to the prosecution or defense of the action." *Id.*

■ Although the source of the right to recovery of attorney fees here arises not from contract or statute but, instead, from the equitable rule that a plaintiff in a shareholder derivative action may recover fees when the action has conferred a substantial benefit on the corporation or its shareholders, *Crandon II*, 342 Or at 569 n 6, that distinction is ultimately unavailing. "We generally adhere to the doctrine of *stare decisis* in considering an issue of statutory construction that we have previously resolved, unless error is plainly shown to exist." *State v. Roberts*, 216 Or App 238, 243, 172 P3d 651 (2007) (internal quotation marks omitted). Here, the scope and content of "legal services related to the prosecution * * * of an action," ORCP 68 A(1), is a matter of statutory construction, which applies to "the pleading, proof and award of attorney fees in all cases, regardless of the source of the right to recovery of such fees." ORCP 68 C(1). Willamette has not "plainly shown" that construction to be erroneous.[13] *Roberts*, 216 Or App at 243. Accordingly, to the extent on remand that plaintiffs establish an entitlement to primary attorney fees under the substantial benefit doctrine, they will be derivatively entitled to recover their "fees on fees."

Reversed and remanded.

---

[13] We note that several other courts have allowed "fees on fees" in substantial benefit cases. *See, e.g., Kinney v. International Broth. of Elec. Workers*, 939 F2d 690, 694 (9th Cir 1991); *Donovan v. CSEA Local Union 1000*, 784 F2d 98, 106 (2d Cir), *cert den*, 479 US 817 (1986); *Pawlak v. Greenawalt*, 713 F2d 972, 980-84 (3d Cir 1983), *cert den*, 464 US 1042 (1984).