Argued and submitted September 23, 2009, affirmed December 8, 2010

Scott FOWLER,
*Plaintiff-Respondent,*

*v.*

Cheri D. COOLEY,
dba Top Notch Homes,
*Defendant-Appellant.*

Multnomah County Circuit Court
070302979; A139311

245 P3d 155

Mark G. Passannante argued the cause and filed the briefs for appellant.

Geoffrey B. Silverman argued the cause and filed the brief for respondent.

Before Haselton, Presiding Judge, and Armstrong, Judge, and Carson, Senior Judge.

ARMSTRONG, J.

### ARMSTRONG, J.

Defendant appeals a judgment for plaintiff in an action under the Oregon Unlawful Trade Practices Act (UTPA), ORS 646.605 to 646.656.[1] Plaintiff sought damages arising from defendant's sale to plaintiff of a single-family home that had a water leak in the basement. Plaintiff alleged that defendant had misrepresented that the house was of sound quality and character and had failed to disclose the material defect that the basement leaked. *See* ORS 646.608(1)(e), (t). After a bench trial, the court awarded plaintiff $12,266.96 in damages. On appeal, defendant assigns error to (1) the trial court's denial of her ORCP 54 B(2) motion to dismiss plaintiff's claim, which asserted that the house had not been purchased for personal, household, or family purposes and, thus, that the sale to plaintiff was not subject to the UTPA; (2) its denial of defendant's motion to strike plaintiff's damages because plaintiff had not presented evidence at trial of the difference between the price paid for the house as represented and the value of the house as sold; and (3) its conclusion that defendant had violated the UTPA, because plaintiff had not presented evidence to support a finding that defendant knew when she sold the house that the basement leaked. We affirm.

We relate the facts in the light most favorable to plaintiff, who prevailed at trial. *Rathgeber v. James Hemenway, Inc.*, 176 Or App 135, 137, 30 P3d 1200 (2001), *aff'd*, 335 Or 404, 69 P3d 710 (2003). In June 2006, plaintiff received a telephone call from a friend, Tillford, who worked for defendant. Tillford knew that plaintiff was interested in purchasing a home in north Portland, so he called to tell plaintiff that defendant was selling a house in the Kenton neighborhood in north Portland.[2] Tillford told plaintiff that defendant had "a couple other prospective buyers waiting to purchase the property if [he] wasn't interested" and communicated "a sense of urgency about [plaintiff's] need to inspect and make a decision on the property that day." Eight months before receiving Tillford's telephone call, plaintiff had purchased

---

[1] All references to the UTPA are to the 2005 version.

[2] Defendant owns some 60 rental homes in the Portland area and sometimes will "buy, fix up and resell properties as well."

the home in northeast Portland in which he was then living. Nonetheless, plaintiff was interested in purchasing the Kenton house because he had a number of friends who lived in the Kenton neighborhood, which made living in that area attractive to him.

Accordingly, plaintiff inspected the house on the day of the call and was accompanied by his friend Smith. When they arrived at the house, plaintiff encountered two men "doing some sheet rock repairs in the basement * * * near [a] sump pump." Plaintiff asked one of the men "what the sump pump was for." The worker responded "that he didn't know anything" and that plaintiff would need to ask defendant questions about the property. Plaintiff's inspection of the property confirmed the basic characteristics of the house that Tillford had described, and later that day he went to defendant's office "to fill out paperwork" for it.

Before going to defendant's office, plaintiff sought the advice of Smith and another friend, Frisch, about "possibly selling [his] current property[,] moving into the Kenton neighborhood[,]" and purchasing defendant's property. Smith recalled that, during his conversation with plaintiff, plaintiff explained to him that "he was looking for another place to live, [because] a lot of his * * * friends[ and] associates[ ] lived in that part of town and he was interested in moving to a different location."

Similarly, Frisch remembered speaking with plaintiff at the time and plaintiff stating that he "was looking at purchasing an investment home, another home." Specifically, Frisch recalled that plaintiff had said that

> "his intent was that he would move into that house and refurbish, remodel, reconstruct, upgrade if you want to call it that, and sell the house that he was currently living in in northeast Portland, and pull the equity out of that home that he had done the same thing, gone in, fixed up, refloored, put hard wood floorings in, and then subsequently do the same thing to the other house, into the new house, live in it and fix it up."

In addition, Frisch "advised [plaintiff], don't do anything as an impulse buy. And, you know, I thought at that time two years ago the housing market was overpriced, over-inflated,

and the bubble was bursting." Plaintiff also remembered that conversation with Frisch and how Frisch

> "advised me that the market was declining, and, you know, as an investment—just as an investment property, it probably was not that great of an investment. And that's when we got into a conversation, you know, about my interest in living in the Kenton neighborhood, and the fact that I had other friends in that neighborhood. And he thought that, you know, as a residence that it would be a good option, because it was a smaller square footage [and] I was a single guy[.]"

After speaking with Smith and Frisch, plaintiff went to defendant's office to discuss the details of the transaction. Among the details that they discussed was the condition and history of the house. According to plaintiff, he asked defendant if there had been any water leaks in the basement, and she replied that there had not been any water leaks and that the sump pump in the basement was just precautionary. Unbeknownst to plaintiff, defendant previously had sold the house to another person, Saenguraiporn, who had experienced several water leaks in the basement after heavy rainfall during the winter of 2005-06. After making various attempts to fix the leaks, and discussions with defendant about the problem, Saenguraiporn had decided that she wanted out of the purchase contract, and defendant had taken the house back. In spring 2006, defendant hired a contractor, Ross, to fix the leaking basement. Ross took several actions to fix the leak, including pouring a cement sidewalk on the side of the house, building a French drain, and installing a sump pump in the basement.

At the conclusion of plaintiff's meeting with defendant and Tillford, plaintiff entered into a lease agreement with defendant and secured a five-year option to purchase the property.[3] Soon thereafter, plaintiff began making improvements to the property, including adding new landscaping, hanging new window blinds, installing cedar shakes on the front of the house, and completing numerous repairs

---

[3] Plaintiff testified that he did not realize that the lease agreement and the option to purchase "didn't give me full ownership of the property" and, instead, thought that he was buying the house when he signed the purchase option agreement.

around the house. In August 2006, plaintiff listed the house for sale at a price roughly $50,000 higher than the price set in his option to purchase it, apparently not realizing that, at that time, the house was not his to sell. In October 2006, after realizing that he "didn't really have all the rights * * * on the property," plaintiff contacted defendant and exercised his purchase option. Plaintiff testified that, in a discussion with defendant before purchasing the house, he told her that "I wanted to leave my options open. I was somewhat undecided when I purchased the house exactly what I was going to be doing with it. I let [defendant] know that my intent either was to rent it, possibly sell it, or to live in it potentially."

One month later, heavy November rains arrived and caused significant water leaks to develop in the basement. Plaintiff attempted to make adjustments to the sump pump to alleviate the flooding, but the leaking continued. In December 2006, plaintiff again listed the house for sale and informed potential buyers in the listing that the "[b]asement needs work to keep dry. Bid for sealing and mold clean up is at the house on kitchen counter. Bid came in under $3200 to cure."

Plaintiff made only one payment on his purchase contract and stopped making payments after discovering the water leak in the basement. In May 2007, defendant filed a declaration of forfeiture of the purchase contract and reclaimed possession of the property. Subsequently, plaintiff filed a UTPA claim against defendant, asserting that he had entered into the purchase contract for the house based on defendant's misrepresentations of the property's history and characteristics and defendant's failure to disclose the basement leak. After a bench trial, plaintiff was awarded the full amount of his requested damages, which included the costs of his improvements to the property and associated labor, the down payment and escrow fees, and the payments made on the lease agreement and purchase contract. Defendant timely appealed.

■　　We begin by addressing defendant's first assignment of error. Defendant contends that the trial court erred in denying her ORCP 54 B(2) motion to dismiss plaintiff's claim,

because plaintiff failed to present sufficient evidence to support a finding that he had purchased the house "for personal, family or household purposes," ORS 646.605(6), and, thus, that the sale of the house was a consumer transaction subject to the UTPA. On appeal of a denial of an ORCP 54 B(2) motion to dismiss a claim, we review the entire record to determine whether sufficient evidence was presented to establish a *prima facie* case on the applicable claim, "[v]iewing the evidence and all reasonable inferences that may be drawn from it in the light most favorable to plaintiff." *Thorson v. Dept. of Justice*, 171 Or App 704, 709, 710, 15 P3d 1005 (2000).

As relevant to this case, a person violates the UTPA

"when in the course of the person's business, vocation or occupation the person * * *:

"(e)   Represents that real estate, goods or services have * * * characteristics, ingredients, uses, benefits, quantities or qualities that they do not have * * *[; or]

"* * * * *

"(t)   Concurrent with tender or delivery of any real estate, goods or services fails to disclose any known material defect or material nonconformity."

ORS 646.608(1)(e), (t). In turn, "real estate, goods or services" are defined as "those which are or may be obtained *primarily for personal, family or household purposes*[.]" ORS 646.605(6) (emphasis added).

■ ■   As explained by the Supreme Court in *Searle v. Exley Express*, 278 Or 535, 540, 564 P2d 1054 (1977), "[i]f goods are customarily bought by a substantial number of purchasers for personal, family or household uses and were, in fact, bought by the plaintiff for his or someone else's use and not for resale, the [UTPA] applies." Thus, *Searle* embodies a two-part test: Is the real estate, good, or service at issue customarily purchased by a substantial number of people for personal, family, or household use (the objective component) and was it, in fact, purchased by the plaintiff for personal, family, or household use, rather than for commercial use or resale (the subjective component). A residential home is

undoubtedly real estate that is customarily bought by a substantial number of people for personal, family, or household use. Thus, plaintiff easily satisfies the objective component of the *Searle* test.

The question remains whether plaintiff satisfied the subjective component. If plaintiff failed to present any evidence that, at the time of purchase in October 2006, he, *in fact*, bought the house for personal use, then the transaction is not within the scope of the UTPA, and the trial court should have granted defendant's ORCP 54 B(2) motion to dismiss plaintiff's UTPA claim. Thus, our task reduces to determining whether any evidence was presented at trial that plaintiff purchased the house intending to make personal use of it. We conclude that such evidence was presented at trial and, hence, that the trial court did not err in denying defendant's motion to dismiss.

In particular, we look to Smith's testimony about the conversation that he had with plaintiff on the day that they inspected the house. Plaintiff's counsel asked Smith if plaintiff had told him how plaintiff intended to use the house. Smith responded that plaintiff had "mentioned that he was looking for another place to live, a lot of his friends and things—his friends, associates, lived in that part of town and he was interested in moving to a different location, was my understanding." From that testimony, a factfinder could reasonably infer that plaintiff did in fact intend to make personal use of the house when he purchased it in October 2006. In light of our standard of review of the denial of a ORCP 54 B(2) motion to dismiss, it does not matter that other evidence was presented that shows that plaintiff was equivocating about his intended use of the property. Rather, Smith's testimony is sufficient to defeat defendant's motion, because it is evidence from which a factfinder could reasonably infer that, at the time of purchase, plaintiff acquired the house primarily for personal use.

We turn to defendant's third assignment of error, which also fails. Plaintiff made two allegations under the UTPA: (1) defendant "failed to disclose [a] material defect," *i.e.*, that the basement leaked—an allegation based on ORS

646.608(1)(t); and (2) plaintiff entered into the purchase contract in reliance on defendant's "false representations" about the "sound quality and characteristic" of the home—an allegation based on ORS 646.608(1)(e). Defendant argues in her third assignment of error that the trial court erred in concluding that defendant had violated the UTPA. Specifically, she contends that, because there was no evidence presented at trial that defendant knew when she tendered delivery of the house that the basement leaked, plaintiff failed to establish that defendant had violated ORS 646.608(1)(t) by failing to disclose a material defect. As the following discussion explains, we conclude that defendant's third assignment of error fails because she cannot establish, on this record, that the trial court relied on a violation of ORS 646.608(1)(t) in rendering its verdict.

At the close of plaintiff's case, defendant moved to strike plaintiff's allegation of misrepresentation under ORS 646.608(1)(e), arguing that plaintiff had failed to present evidence that he had relied on the alleged misrepresentations about the sound quality and character of the house. The trial court denied that motion. Notably, although defendant's counsel expressed his belief that "the only evidence that [plaintiff] adduced was for an intentional misrepresentation[,]" defendant did not make a separate motion to strike plaintiff's allegation that defendant had violated ORS 646.608(1)(t) by failing to disclose a material defect—that the basement leaked. Defendant's sole contention in her third assignment of error is that there was insufficient evidence for the trial court to find liability under ORS 646.608(1)(t). For that to be error, defendant must show that the trial court, in fact, relied on ORS 646.608(1)(t) in reaching its verdict. On this record, defendant simply cannot show that.

First, defendant did not move to strike plaintiff's allegation, based on ORS 646.608(1)(t), that defendant had failed to disclose that the basement leaked and, thus, did not ask the trial court for a legal ruling on whether sufficient evidence had been presented to support that allegation. Second, the trial court's general judgment did not differentiate between the two UTPA allegations and explain whether and how it relied on the different provisions; rather, the judgment simply stated that the court "returned a verdict in favor of

plaintiff on his First Claim for Relief, Unlawful Trade Practices." Accordingly, defendant's third assignment of error fails because defendant cannot show that the trial court erred by relying on a violation of ORS 646.608(1)(t) as the basis for its verdict.[4]

■       Finally, we address defendant's second assignment of error, which is that the trial court erred in denying defendant's motion to strike plaintiff's damages and in entering judgment for $12,266.96. At the close of plaintiff's case, defendant moved to strike "all of the damages" because, according to defendant, the proper measure of actual damages under the UTPA for the sale of property is the difference between the value of the property as represented and its actual value. Defendant asserted that plaintiff had not presented any evidence of such a difference in value and, thus, that plaintiff's damages were limited to the statutory minimum of $200 if defendant was found to have violated the UTPA. Defendant further asserted, as we understand her argument, that plaintiff "pled and proved * * * rescission damages," which she maintained are not available under the UTPA.[5] Defendant renews those arguments on appeal, and, for the reasons that follow, we reject them.

---

[4] We recognize that defendant asserted in closing argument that no evidence had been presented from which to find that defendant knew when she sold the house that the basement leaked and, thus, had failed to disclose a material defect in violation of ORS 646.608(1)(t). Accordingly, the situation might be different if the trial court's judgment *had* relied on a violation of ORS 646.608(1)(t) as the basis for its verdict, because, in that posture, defendant's closing argument might have been sufficient to preserve her third assignment of error. *See State v. Andrews*, 174 Or App 354, 357-58, 27 P3d 137 (2001) (noting that, in a court trial, a "matter of law"-like contention can be adequately preserved by closing argument to that effect), *overruled in part on other grounds by State v. Rutley*, 202 Or App 639, 645, 123 P3d 334 (2005).

Alternatively, we also note that, even if defendant *had* moved to strike plaintiff's ORS 646.608(1)(t) allegation and the court *had* erred in denying that motion, defendant still would not be entitled to reversal and a new trial in light of the court's general verdict for plaintiff. *Shoup v. Wal-Mart Stores, Inc.*, 335 Or 164, 174-79, 61 P3d 928 (2003). That is because sufficient evidence exists to support plaintiff's ORS 646.608(1)(e) allegation that defendant had misrepresented the quality and characteristics of the house. *See Shoup*, 335 Or at 176, 178-79, 179 n 6 ("[A]ppellate courts * * * may not apply the 'we can't tell' rule to order a new trial in a case involving a judgment on a general verdict based on multiple specifications, one of which is invalid, if there is evidence to support another, valid specification.").

[5] The purpose of rescission of a contract "is to unwind the transaction and to put the parties in the same position they would have been in if the transaction had

The UTPA provides that

> "any person who suffers any ascertainable loss of money or property, real or personal, as a result of willful use or employment by another person of a method, act or practice declared unlawful by ORS 646.608, may bring an individual action in an appropriate court to recover *actual damages* or $200, whichever is greater."

ORS 646.638(1) (emphasis added). As we have previously explained, the legislative history of the 1971 enactment of ORS 646.638 demonstrates that the "actual damages" provision of the statute serves "to provide for 'restitution,' i.e., restitution for economic loss suffered by a consumer as the result of a deceptive trade practice." *Gross-Haentjens v. Tharp*, 38 Or App 313, 317, 589 P2d 1209 (1979).[6] In addition, "ORS 646.656 provides that the remedies specified in the [UTPA] are in addition to all other civil remedies existing at common law. This indicates legislative intent to create a special remedy *different* from those that exist at common law."[7] *Raudebaugh v. Action Pest Control, Inc.*, 59 Or App 166, 171, 650 P2d 1006 (1982) (emphasis added).

Accordingly, we conclude that the UTPA provides an independent means for plaintiffs to obtain damages that

---

not been entered into—so far as possible." *Daugherty v. Young*, 47 Or App 585, 591, 615 P2d 341 (1980). Thus, the damages awarded on rescission are those required "to restore a plaintiff to the position occupied before the defendant's wrongful acts," *Black's Law Dictionary* 448 (9th ed 2009), and necessarily involve restitution, *Johnston v. Gilbert*, 234 Or 350, 354, 382 P2d 87 (1963) ("Restitution is an integral part of rescission[.]").

[6] In *Gross-Haentjens*, we discerned the restitutionary purpose of ORS 646.638(1) from testimony by Oregon's Attorney General in 1971, Lee Johnson, to the House Judiciary Committee about an early House version of the bill that ultimately became ORS 646.638(1). 38 Or App at 317. Johnson had headed a committee that had drafted that version of the bill, and he testified that the 1971 bill creating the modern version of the UTPA was necessary, among other reasons, because "private individuals who are aggrieved by [a] deceptive trade practice should have some way of attaining restitution." Testimony, House Committee on Judiciary, HB 1088, Feb 10, 1971, Ex 3 (statement of Lee Johnson in Consumer Protection Act Proposal).

[7] Furthermore, ORS 646.636 provides that

"[t]he court may make such additional orders or judgments as may be necessary to restore to any person in interest any moneys or property, real or personal, of which the person was deprived by means of any practice declared to be unlawful in ORS 646.607 or 646.608, or as may be necessary to ensure cessation of unlawful trade practices."

provide restitution for ascertainable losses caused by a defendant's unlawful trade practice. We understand that to be true even when, as here, the purchaser relinquishes the property but does not do so by an express rescission of the contract. Thus, contrary to defendant's understanding of how "actual damages" must be assessed under the UTPA, plaintiff could, and did, properly claim damages reflecting the money that he had paid to defendant and the money that he had spent on improvements to the house as a result of defendant's misrepresentations. Defendant's proposed method for assessing damages would be appropriate if plaintiff had kept the house, but is inapposite here where he has relinquished possession of the home to defendant. *See, e.g., Martin v. Cahill*, 90 Or App 332, 336, 752 P2d 857 (1988) (noting that, where plaintiff maintained possession of the real property in dispute, damages under the UTPA are assessed as the "difference between the value of the property as it was represented to be and as it is"). Consequently, the trial court did not err in denying defendant's motion to strike all of plaintiff's alleged damages other than the statutory minimum damages of $200.[8]

Affirmed.

---

[8] Defendant asserts in a footnote in her reply brief that, if plaintiff had made a claim for rescission, defendant would be entitled to offset any damages awarded on that basis by the amount of the rental value of the house. To the extent that that assertion could be understood as an assignment of error to the trial court's damages award, it comes too late. *See Johnson v. Best Overhead Door, LLC*, 238 Or App 559, 563 n 2, 242 P3d 740 (2010) ("A party may not raise an issue for the first time in a reply brief.").