Argued and submitted November 7, 2013, affirmed on appeal; reversed and remanded on cross-appeal February 25, petition for review denied July 30, 2015

(357 Or 595)

Thein HTAIKE
and Naw Myint,
*Plaintiffs-Respondents*
*Cross-Appellants,*

*v.*

Rosalind SEIN,
aka Daw Myint Myint Sein;
Victor Sein; Sanda Altman;
and Family Trust of Rosalind Sein,
*Defendants-Appellants*
*Cross-Respondents.*

Washington County Circuit Court
C093264CV; A149935

344 P3d 527

Margaret H. Leek Leiberan argued the cause for appellants-cross-respondents. With her on the briefs was Jensen & Leiberan.

Emil R. Berg argued the cause for respondents-cross-appellants. With him on the briefs were Leonard D. DuBoff and The DuBoff Law Group, LLC.

Before Ortega, Presiding Judge, and Sercombe, Judge, and Hadlock, Judge.

ORTEGA, P. J.

## ORTEGA, P. J.

Plaintiffs filed this action seeking recovery of over $200,000 on the general theory that defendants had secured a series of promissory notes at exorbitant interest rates from plaintiffs through loansharking. Over the years, plaintiffs paid substantial sums on those notes but, despite repeated requests from plaintiffs, defendants never gave them an accounting of how much they owed at any given time. Seven years after the first note was given, defendants issued past due notices, asserting that plaintiffs still owed more than $180,000 to defendants. At that point, plaintiffs stopped making payments, consulted an attorney, and brought an action alleging several claims for relief. Before trial, the trial court granted summary judgment to defendants on plaintiffs' claim for fraud and a claim brought under the Oregon Racketeer Influenced and Corrupt Organization Act (ORICO), ORS 166.715 - 166.735. After a bench trial, the court concluded that plaintiffs had proved claims for restitution, unjust enrichment, money had and received, and rescission, and entered judgment for plaintiffs awarding damages, prejudgment interest, attorney fees, costs, and an enhanced prevailing party fee. Defendants appeal, raising eight assignments of error, and plaintiffs cross-appeal, claiming that the trial court incorrectly granted summary judgment on plaintiffs' ORICO claim. We affirm on appeal, and reverse and remand on cross-appeal.

## I.  BACKGROUND

We state the facts in the light most favorable to plaintiffs, who prevailed at trial.[1] *Fowler v. Cooley*, 239 Or App 338, 340, 245 P3d 155 (2010). The facts in this case are extremely convoluted, but an exhaustive history of the various loans and promissory notes involved in this case is not necessary to our resolution of the appeal and cross-appeal. Accordingly, we state the general background facts that are necessary to provide context to our analysis, and where necessary, we include additional facts that relate to specific assignments of error.

---

[1] To the extent that we discuss facts relevant to plaintiffs' cross-appeal, we likewise state the facts in light most favorable to plaintiffs, the nonmoving party at summary judgment. ORCP 47 C.

To begin, all of the parties are Burmese immigrants who are connected through the Burmese community that exists in the United States. The parties' dealings began in February 2001 when plaintiffs, at the suggestion of defendant Sanda Altman, borrowed $40,000 from Altman's mother, defendant Rosalind Sein, for a down payment and improvements on a home in Beaverton. Plaintiffs knew Sein as a respected "elder" of the Burmese community who was a member of Buddhist monasteries in California. Plaintiffs also knew that Sein was in the business of lending money to other members of the Burmese community. To memorialize the loan, plaintiffs traveled to Sein's home in California, where they executed a promissory note to Sein. The terms of the note were 5 percent interest per month, compounded monthly, with monthly payments of $2,000 plus interest. Plaintiffs testified that the note was already prepared when they arrived and that they did not ask questions of Sein out of respect for her status as an elder and because they trusted her. The note was secured by a deed of trust to the home that plaintiffs had purchased, although Sein had told plaintiffs previously that she would not secure the note with a lien on the home.

Plaintiffs made their first payment of $4,000 to Sein three weeks later, and thereafter made payments ranging from $2,100 to $3,900 each month for the rest of 2001. In total, plaintiffs paid Sein $31,900 in 2001. Sein did not provide plaintiffs with receipts or any other documentation.

Plaintiffs' business experienced a downturn in late 2001, and they struggled to make payments to Sein throughout 2002. They missed some payments and made others late. In response, Sein informed plaintiffs that her business partner, "Linda," would "sue them" and "throw them in jail." After plaintiffs filed this action, Sein admitted that she had invented "Linda" as a method of dealing with borrowers who missed payments. In 2002, plaintiffs paid Sein $15,300, but Sein refused plaintiffs' requests for an accounting.

Plaintiffs' financial troubles persisted into 2003 and, in May of that year, they attempted to refinance their home through their mortgage company. The mortgage company informed plaintiffs that they could not refinance unless

Sein agreed to subordinate her interest in the property. Sein refused, but offered plaintiffs new terms on their existing debt to her. On her instruction, plaintiffs signed a new promissory note for $60,000 with an annual interest rate of 12 percent. Further, she informed them that the $60,000 was for the balance of the original $40,000 note, plus interest, penalties, and late fees. Sein rejected their requests for an accounting or other documentation to justify that figure, and explained that she was simply trying to negotiate on their behalf with "Linda." Plaintiffs made payments in 2003 totaling $11,095.

In 2004, plaintiffs borrowed an additional $20,000 from Sein to pay for a trip to Burma for a family funeral. They gave Sein a note for $20,000 at two percent interest per month, and the note was secured by another deed of trust to their home. Later in 2004, plaintiffs fell behind on their mortgage, and the bank threatened them with foreclosure. Plaintiffs worked out a repayment plan with the bank, but Sein informed them that "Linda" was demanding payment on the notes and that they would have to sell their home to satisfy their obligations. Sein also counseled plaintiffs that the house would need work before they put it on the market. Plaintiffs agreed to borrow an additional $40,000 from Sein to fix up the house. They gave Sein a note at two percent interest per month and a deed of trust to secure it.

Sein put Altman in charge of the home sale and dictated the asking price to plaintiffs. Plaintiffs received an offer at the asking price in June 2005. However, Altman informed plaintiffs that Sein would release her liens and allow the sale to close only if plaintiffs gave her an installment note for $70,000 with an annual interest rate of 24 percent. Plaintiffs signed the note and a trust deed. Both documents were backdated to December 2004.

After the sale closed, Sein received $74,420 from the proceeds. Before closing, Sein demanded that plaintiffs sign another installment note for $56,000 with five percent interest per month. She claimed that that note was for money that they still owed her, plus $10,000 for Altman's services related to the house sale. She threatened them with legal action and jail. In addition to the money that Sein

received from the sale, plaintiffs paid her $44,500 in 2005 and $34,400 in 2006. Again, all of plaintiffs' requests for an accounting were rebuffed.

In 2006, at the demand of Sein, plaintiffs gave five more notes to Sein ranging from $5,000 to $10,000 at five percent interest per month. Sein instructed plaintiffs to deposit the funds related to those notes into her account so that it would appear to "Linda" that plaintiffs had paid more than $34,400 that year. That pattern was repeated in 2007: plaintiffs paid Sein $39,600; Sein demanded that they give another $5,000 note. In 2007, Sein told plaintiffs that they could make reduced payments and that the new principal balance was $80,000. They made payments of $19,125 during 2008, but received a "past due" notice from defendant Victor Sein on June 5, 2008, that showed a balance of $187,400 and demanded payment of $7,933 within two weeks. On June 23, 2008, plaintiffs received another notice from Victor that showed a balance of $195,942 and demanded payment of $9,300 by July 7, 2008. At that point, plaintiffs stopped making payments, and sought the counsel of an attorney.

In June 2009, plaintiffs filed an action against defendants alleging an ORICO claim, as well as claims for restitution, declaratory judgment, unjust enrichment, money had and received, breach of fiduciary duty, and fraud. As the basis for their claims, plaintiffs alleged facts that demonstrated a pattern of threatening, manipulative, and deceitful behavior by defendants that induced plaintiffs to give a series of notes at exorbitant interest rates to Sein. Plaintiffs later amended their complaint to add a claim for rescission. They sought damages of $209,367 to account for money paid to defendants in excess of the principal that plaintiffs had actually received. Alternatively, plaintiffs sought a declaratory judgment that they owed no further obligation to defendants, or a judgment rescinding the notes because they were "defective in their formation." Plaintiffs alleged a right to reasonable attorney fees under ORICO.

Before trial, defendants moved for summary judgment, arguing that plaintiffs' claims for fraud, breach of fiduciary duty, and recovery under ORICO were barred

by the applicable statutes of limitations. Defendants contended that plaintiffs' claims for unjust enrichment, restitution, money had and received, and rescission were based on allegations that defendants had charged a usury rate, and that ORS 82.010(4) precluded any claim by plaintiffs seeking to recover interest that they had already paid to defendants because a borrower may use ORS 82.010(4) only as a defense in an action brought by a lender seeking to collect on the usurious note. Further, defendants maintained that ORS 82.010 provided plaintiffs an exclusive "remedy," such that no other provision in law or equity authorized plaintiffs' remaining claims. The trial court granted summary judgment on the fraud, breach of fiduciary duty, and ORICO claims, but otherwise denied summary judgment.

The case proceeded to trial on plaintiffs' remaining claims. After a bench trial, the court concluded that plaintiffs had proved their claims for restitution, declaratory judgment, unjust enrichment, money had and received, and rescission. The court explicitly found that plaintiffs were credible and defendants were not credible, going so far as to indicate that Sein's testimony "was perjury; she contradicted herself and the testimony of her son and daughter, both of whom sought to distance themselves from any real knowledge of the transactions." The court also explained in some detail what it termed Sein's "deliberate and comprehensive effort to deceive her borrowers and the court." In calculating damages, the court found that plaintiffs had received $100,000 from defendants, and had paid defendants about $267,000. Accordingly, the court entered a judgment against defendants for $167,556 in damages, $105,414 in prejudgment interest, $197,374 in attorney fees, $14,406 in costs, and an enhanced prevailing party fee of $5,500.

## II.   ANALYSIS

Defendants appeal, raising eight assignments of error. We reject defendants' first, fourth, fifth, and eighth assignments of error without published discussion. We break defendants' remaining assignments of error into three categories. First, defendants' second and third assignments challenge the trial court's ruling that the usury statute did not preclude plaintiffs' claims. Second, defendants' sixth

assignment challenges the trial court's application of the statute of limitations. Finally, defendants' seventh assignment challenges the trial court's decision to allow plaintiffs to amend their complaint after trial to allege an entitlement to attorney fees. For the reasons explained below, we reject all of defendants' assignments of error, and affirm on appeal.

Plaintiffs cross-appeal, challenging the court's pretrial ruling granting summary judgment against their ORICO claim on the basis of the statute of limitations. We conclude that the court erred in granting summary judgment on that claim, and reverse and remand on that basis.

A. *Usury Statute*

Defendants' second and third assignments focus on ORS 82.010. As relevant, ORS 82.010(3)(a) provides the legal rate of interest for certain transactions and generally prohibits a person from making a business loan of less than $50,000 at an annual interest rate greater than 12 percent. ORS 82.010(4) provides that a person who has violated subsection (3)

"shall forfeit the right to collect or receive any interest upon any loan for which a greater rate of interest or consideration than is permitted by subsection (3) * * * has been charged, contracted for or received. The borrower upon such loan shall be required to repay only the principal amount borrowed."

Defendants, in their second assignment of error, argue that in denying summary judgment the trial court incorrectly ruled that plaintiffs could use the usury statute "affirmatively" to recover interest that they had "voluntarily" paid.[2] On appeal, defendants reprise their argument that ORS 82.010 "does not provide any affirmative remedy or create a right of action for the borrower." Defendants proceed to argue that ORS 82.010(4) simply provides a penalty to the lender for violating the statute—the lender forfeits the right to collect interest. According to defendants, therefore, the statute can be used only as a defense or "shield" by

---

[2] An order denying summary judgment is reviewable if it rests on a purely legal contention that does not require establishing predicate facts. *Seidel v. Time Ins. Co.*, 157 Or App 556, 560, 970 P2d 255 (1998).

the borrower in an action by the lender seeking to collect usurious interest. They claim that the trial court erred in this case because it allowed plaintiffs to use ORS 82.010(4) as a "sword" when it allowed plaintiffs to use the usury statute as a basis for affirmative relief to recover interest that they had already paid.

Defendants' third assignment of error follows on their second assignment. They assert that ORS 82.010 is the exclusive remedy in actions that involve allegations of usury. That is, they claim that plaintiffs' remedy was limited to any relief to which they might be entitled under ORS 82.010, but that their claims for unjust enrichment, restitution, money had and received, or rescission were unavailable to them. In other words, defendants assert that, when a loan is made at usurious rates, the borrower can use ORS 82.010(4) as a defense in any action brought by the lender to collect on the loan, but that the borrower cannot bring an affirmative claim to recover damages related to the lender's usurious conduct.

The trial court disagreed with defendants' position on ORS 82.010, and so do we. First, it bears emphasis that plaintiffs did not assert a cause of action under ORS 82.010 to recover interest that they had paid to defendants. We do not decide whether such an action could be sustained because we need address only defendants' argument that the legislature's enactment of ORS 82.010 provided plaintiffs with the exclusive remedy in this case.

Defendants rely in part on *Crisman v. Corbin*, 169 Or 332, 348, 128 P2d 959 (1942), which held that a prior version of the usury statute could be used by a borrower only as a defense in an action brought by the lender to recover judgment on a note or loan, not as a cause of action. *Crisman* is inapposite to the question before us. The question here is not whether a borrower could sustain a cause of action under the usury statute to recover against a usurious lender, but whether *other claims* are available to a borrower to seek relief from a usurious lender. *Crisman* does not answer that question. In fact, *Crisman* indicates that, although a borrower could not use the then-existing usury statute as the basis for a claim, the borrower had other claims for relief

available. *Id.* at 350. Specifically, at the time of *Crisman*, the distinction between law and equity courts still existed in Oregon, and the court decided that a law court could not grant the plaintiff the relief that he had requested under the usury statute. In the end, the court concluded that the plaintiff was entitled to equitable relief for the amount of the usurious interest because equity would not permit the defendant to collect amounts that the defendant had admitted were usurious. *Id.*

We conclude similarly that the existence of a statute that provides borrowers a defense from the collection of interest on usurious loans does not preclude the claims that plaintiffs brought in this case. It is generally accepted that, if there is no statutory basis to bring an action to recover usurious interests paid, equitable relief may be available. 47 CJS *Interest & Usury* § 291 (2008). Also, at common law a debtor who has made payments in excess of the legal rate of interest may recover them in an action brought for that purpose, including in an action for money had and received. *Id.* § 312. Defendants have failed to persuade us that ORS 82.010—a statute that provides a *defense* in an action to collect from a borrower—was intended to preclude a borrower from bringing any claim to recover payments in excess of the legal rate of interest.

Further, defendants' assertions fail to acknowledge that plaintiffs' claims were not based entirely on the fact that some of the notes exceeded the maximum rate allowed in ORS 82.010, but also sought relief on the equitable principle that, given defendants' wrongful conduct (beyond charging usurious rates), it would be unjust for defendants to retain the interest that plaintiffs had paid. Defendants have not demonstrated why ORS 82.010 would prohibit plaintiffs from pursuing relief based on that equitable principle.

B. *Statute of Limitations*

Defendants, in their sixth assignment of error, argue that the trial court incorrectly determined that the six-year statute of limitations for actions on contract, ORS 12.080(1), applied to plaintiffs' claims, instead of the two-year statute of limitations for tort actions, ORS 12.110(1).

We begin with the trial court's ruling on the statute of limitations. The court apparently reached alternative conclusions and determined that, regardless of which statute of limitations it applied, plaintiffs' claims were not barred. The court ruled that the six-year statute of limitations for contracts applied and that, even though two of the notes fell outside the six-year period in ORS 12.080(1), defendants' actions "revived" those notes. Alternatively, the court ruled that if the two-year period of ORS 12.110(1) applied, under the "discovery rule" in ORS 12.110(1), plaintiffs' claims accrued in 2008 when they first consulted an attorney.

On appeal, defendants reprise their argument that ORS 12.110(1) is the correct statute of limitations because the gravamen of plaintiffs' claims for restitution, unjust enrichment, rescission, and money had and received was that defendants "falsely informed" plaintiffs that they needed to sign promissory notes or that their payments were insufficient. That is, put simply, defendants assert that because plaintiffs' rationale for recovery was defendants' fraudulent conduct, ORS 12.110(1) applied to plaintiffs' remaining claims.

Plaintiffs counter that the trial court correctly applied ORS 12.080(1) because the gravamen of their claims was based on the promissory notes, not fraud or other tortious conduct. In particular, plaintiffs argue that defendants' fraudulent conduct arose in the context of the formation and performance of contracts, *i.e.*, the promissory notes, and that their damages were based on that relationship.

We conclude that the statute of limitations in ORS 12.110(1) applies to plaintiffs' claims. The "gravamen or the predominant characteristics" of an action, not the plaintiff's election, determines whether the tort or contract statute of limitations applies. *Lindemeier v. Walker*, 272 Or 682, 685, 538 P2d 1266 (1975). To determine the predominant characteristics of an action, we examine the legal source of the defendant's liability, the factual setting of the dispute, the injuries asserted by the plaintiff, and the plaintiff's claimed measure of damages. *Securities-Intermountain v. Sunset Fuel*, 289 Or 243, 258-60, 611 P2d 1158 (1980). We agree with defendants that the gravamen of plaintiffs' claims is grounded in tort. Contrary to plaintiffs' assertions, plaintiffs'

claims do not place the promissory notes at the center of the allegations other than to assert that the notes, because of usurious rates, contributed to the harm that plaintiffs suffered. Plaintiffs did not assert that defendants breached any specific contractual obligations, nor can any of their claims fairly be said to turn on contract principles.[3] Rather, plaintiffs asserted that the notes should be rescinded because they were "defective at formation" because of the usurious rates. Moreover, at the heart of plaintiffs' allegations was an ongoing course of conduct by defendants that included deceit, misrepresentations, and coercion. Accordingly, we conclude that the predominant characteristics of plaintiffs' claims sound in tort and that ORS 12.110(1) applies.

Of course, our determination that ORS 12.110(1) governs in this case does not end the matter. As noted, the trial court concluded that, even if ORS 12.110(1) applies, plaintiffs' claims were timely under the discovery rule that is incorporated within that statute. Under that rule, the limitations period begins to run from the earlier of two possible events: "(1) the date of the plaintiff's *actual discovery* of injury; or (2) the date when a person exercising reasonable care *should have discovered* the injury, including learning facts that an inquiry would have disclosed." *Greene v. Legacy Emanuel Hospital*, 335 Or 115, 123, 60 P3d 535 (2002) (emphasis in original). Discovery of an injury occurs when a plaintiff knows or should have known of the existence of three elements: "(1) harm; (2) causation; and (3) tortious conduct." *Gaston v. Parsons*, 318 Or 247, 255, 864 P2d 1319 (1994). Accordingly, "the facts that a plaintiff must have discovered or be deemed to have discovered include not only the conduct of the defendant, but also, under *Gaston*, the tortious nature of that conduct." *Doe v. Lake Oswego School District*, 353 Or 321, 331, 297 P3d 1287 (2013).

---

[3] We acknowledge that some of the claims brought by plaintiffs have been labeled quasi-contractual in nature in other cases, and there have been instances in which we have stated that the six-year statute of limitations for implied contracts applies in cases involving a claim for money had and received. *See Angelini v. Delaney*, 156 Or App 293, 303, 966 P2d 223 (1998). However, we look to the gravamen of the plaintiff's claim, not just the label of the plaintiff's claim. Therefore, our application of the six-year statute of limitations in *Angelini* does not preclude our determination in this case that plaintiffs' claim for money had and received, as well as plaintiffs' other claims, are subject to ORS 12.110(1).

To determine what facts a plaintiff should have known, "[t]he discovery rule applies an objective standard—how a reasonable person of ordinary prudence would have acted in the same or a similar situation." *Kaseberg v. Davis Wright Tremaine, LLP*, 351 Or 270, 278, 232 P3d 980 (2011). As the Supreme Court recently stated, "[i]n applying that standard, a court must consider the facts from the perspective of a reasonable person in the circumstances of the plaintiff." *Doe*, 353 Or at 333. Those circumstances include, but are not limited to, the relationship between the parties and the nature of the harm suffered. *Id.* Ordinarily, application of the objective standard presents a factual question for the factfinder. However, the question can be decided as a matter of law if "the only conclusion a reasonable [factfinder] could reach is that the plaintiff knew or should have known the critical facts at a specified time and did not file suit within the requisite time thereafter." *T. R. v. Boy Scouts of America*, 344 Or 282, 296, 181 P3d 758 (2008).

Defendants claim generally that "plaintiffs were aware of information which would have caused a reasonable person to seek legal advice as to their rights" substantially before 2007. Specifically, defendants assert that plaintiffs, who had signed each promissory note and trust deed, were aware of the interest rates and payments contained within each note. Further, defendants maintain that the relationship between the parties had been "troubled for many years" in that Sein had repeatedly rejected plaintiffs' requests for accountings or had failed to deliver when she told them that she would provide an accounting. Finally, defendants point out that plaintiffs could not refinance their home in 2003 because Sein had a lien on the home and would not consent to subordinating her interest. According to defendants, those facts and circumstances would have led reasonable people to seek legal advice as to their rights.

To conclude that the trial court erred in this matter, we would have to decide that a reasonable factfinder could *only* find that, because plaintiffs knew of the facts advanced by defendants above, a reasonable person in plaintiffs' position would have investigated and discovered harm caused by Sein's tortious conduct. For the reasons explained below, we cannot reach that conclusion.

First, plaintiffs' relationship with Sein informs the assessment of the reasonableness of plaintiffs' actions. In general, "[w]hen a potential tortfeasor is in a relationship of trust and confidence to a plaintiff and makes assurances to the plaintiff, those assurances may 'have a bearing on whether a reasonable person would be aware of the substantial possibility of tortious conduct.'" *Kaseberg*, 351 Or at 279 (quoting *Gaston*, 318 Or at 257). Here, although the relationship between plaintiffs and Sein is not a relationship that we would usually label as one of "trust and confidence" (*e.g.*, attorney/client, doctor/patient), the nature of the relationship bears on whether plaintiffs, in order to be deemed reasonable, must have investigated earlier whether Sein's conduct was tortious. *See Doe*, 353 Or at 333 (concluding that, in determining whether the plaintiffs knew that their teacher's sexually abusive touching was offensive when the touching occurred, their status as minors, their relationship with the teacher, and the nature of the harm, could have allowed a jury to conclude that the plaintiffs reasonably did not understand the offensiveness of the conduct at the time of the sexual abuse). Sein was a respected elder within the Burmese community who was in the business of lending money to other Burmese immigrants. There was evidence that "younger" Burmese show extreme deference to Burmese elders. Plaintiffs testified that, out of respect for Sein's position in the Burmese community, they trusted her and were predisposed to refrain from questioning her assurances and her insistence on the bases and required direction of various transactions.

There is also evidence that supports a pattern of coercion throughout the parties' dealings. Sein used threats by her fictitious business partner, "Linda," of legal action and jail to coerce plaintiffs into complying with Sein's demands. Her use of "Linda" concealed her misconduct. As courts have recognized, more than one person may be potentially responsible for a plaintiff's harm. *Id.* at 280. Therefore, a plaintiff's "awareness of the role of one potential tortfeasor may not necessarily alert the [plaintiff] to the role of the other." *Id.* In this case, plaintiffs' awareness of "Linda's" actions as described by Sein and the actions of the other defendants all were designed to, and did, obscure Sein's own actions.

Finally, a factfinder could consider evidence in the record that, because Burma lacked institutional lenders, private loans at high interest rates were typical in Burma, and evidence that plaintiffs were not sophisticated in financial matters.

A reasonable factfinder *could* find that plaintiffs should have known facts that alerted them to Sein's tortious conduct well before they consulted an attorney in 2008. However, a reasonable factfinder is charged with considering how a reasonable person of ordinary prudence would have acted *in the same or similar situation." Id.* at 278. Given plaintiffs' situation, their position and status in relation to Sein, and the concerted effort by defendants to conceal Sein's tortious conduct and to obfuscate the harm through coercion and duplicitous behavior, we cannot conclude that, because plaintiffs (1) knew the details of the promissory notes they signed, (2) knew that Sein had refused or neglected to give them an accounting when they requested one, and (3) knew that Sein refused to subordinate her interest when plaintiffs attempted to refinance their home, the *only* conclusion that a reasonable factfinder could reach is that plaintiffs knew or should have known the harm caused by defendants' tortious conduct and investigated "substantially before 2007." Rather, the record supports a conclusion that a reasonable person in plaintiffs' situation would have delayed investigating the tortious nature of defendants' actions until a time period within two years of when they filed their complaint.

C. *Attorney Fees*

In their seventh assignment, defendants maintain that the trial court abused its discretion when it allowed plaintiffs to amend their complaint after trial to allege a new basis for attorney fees. Plaintiffs originally pleaded an entitlement to attorney fees pursuant to the attorney-fee provision of the ORICO, ORS 166.725(14). As noted, the trial court granted summary judgment to defendants on the ORICO claim because of the statute of limitations. After plaintiffs prevailed at trial on the remaining claims, they indicated that they intended to seek attorney fees. Defendants objected, noting that no basis for an entitlement to attorney fees remained in the case. Plaintiffs moved to

amend their complaint under ORCP 23 to assert that they were entitled to attorney fees pursuant to an attorney-fee provision in the promissory notes and ORS 20.096 (providing for reciprocity of attorney fees and costs in proceedings to enforce a contract).

The trial court allowed plaintiffs to amend their complaint to assert an entitlement to attorney fees pursuant to the notes, and the parties followed the procedure set forth in ORCP 68 C. The court determined that plaintiffs were entitled to attorney fees and included in the general judgment an award of over $197,000 in attorney fees to plaintiffs.

Defendants argue that the trial court abused its discretion by allowing plaintiffs to amend their complaint after trial to assert a basis for attorney fees. They assert that they had no notice that plaintiffs were seeking attorney fees on any basis other than ORS 166.725(14), and that they did not know that they were at risk of an attorney fee award of almost $200,000.

In general, ORCP 68 C(2) requires a party seeking attorney fees to assert that right in a pleading. However, allowing a party to amend its complaint after trial to assert a basis for attorney fees is not unprecedented. In fact, we have stated that ORCP 23, which requires that leave to amend be freely given when justice requires, "extends to a motion to amend a pleading to assert an entitlement to attorney fees under ORCP 68 C where the amendment is allowed before entry of final judgment and the defendant has not been prejudiced." *Crandon Capital Partners v. Shelk*, 219 Or App 16, 41, 181 P3d 773, *rev den*, 345 Or 158 (2008).

Defendants' sole argument is that they were prejudiced by the amendment in this case because, if they had known that they might be subject to attorney fees, they might have made settlement offers. According to defendants, the amendment came too late for them to take any action to avoid or limit their liability for attorney fees, and that, as a matter of law, defendants suffered prejudice as a result.

In *Benj. Franklin Fed. Savings and Loan v. Phillips*, 88 Or App 354, 357, 745 P2d 437 (1987), we affirmed a trial

court's decision to allow an amendment pursuant to ORCP 68 C to plead an entitlement to attorney fees. In that case, the plaintiff moved to amend to plead a right to attorney fees after the defendant had objected to a proposed judgment that included attorney fees. The trial court allowed the amendment, and awarded fees in the final judgment. We noted that ORCP 23 A liberalized the process of amending pleadings and that the trial court has broad discretion in making that determination. We concluded that nothing in ORCP 68 C suggested that an amendment to comply with the rule is precluded, and we further concluded that the record failed to show any prejudice to the defendant.

A few years later, in *Hall v. Fox*, 106 Or App 377, 379, 808 P2d 99 (1991), we affirmed a trial court's decision to allow the plaintiff to amend her complaint to allege entitlement to attorney fees after trial. In that case, the defendant claimed that he was prejudiced by the amendment after trial because he did not have "an opportunity, prior to trial, to evaluate the entirety of [the] plaintiff's claim so as to be fully informed on whether or not to settle." *Id.* at 379-80. We ultimately determined that the defendant had not suffered any prejudice because the plaintiff had gone to trial on a claim that did not entitle her to attorney fees. The plaintiff did not gain the right to claim attorney fees until the trial court, after trial, allowed her to amend her complaint to state a claim for reformation and to enforce a contract. It was at that moment that she gained the right to claim fees, and we concluded that the defendant could not have settled that claim before trial because it was not asserted until *after* trial. We also noted that the "defendant was not surprised by the contract provision; he had counterclaimed for attorney fees under the contract, and the contract was in evidence." *Id.* at 380.

We acknowledge that this case is not in the same posture as *Hall*. Here, the claims that plaintiffs ultimately prevailed on existed prior to trial. However, defendants essentially assert that prejudice is established any time that the trial court allows a party to amend a pleading to assert a right to attorney fees after trial, but before final judgment, because that party "might have" made settlement offers if it had known that it might be subject to an attorney fee award.

We decline to adopt such a rigid rule. Although we do not foreclose the possibility that a party could establish prejudice of the type that defendants assert here, we do not agree that such prejudice exists simply as a matter of law. Here, defendants' blanket statement that they "might have" made settlement offers is not, in and of itself, enough to establish prejudice, particularly given our conclusion below that the trial court erred in dismissing plaintiffs' ORICO claim.

D.  *Plaintiffs' Cross-appeal: ORICO Claim*

Finally, we address plaintiffs' cross-appeal. As noted, the trial court granted summary judgment on plaintiffs' ORICO claim. Plaintiffs assert that that was error, and we agree.

Defendants' sole basis for summary judgment was that the statute of limitations had run. The ORICO statute of limitations, ORS 166.725(11)(a), provides, in relevant part:

> "Notwithstanding any other provision of law, a criminal or civil action or proceeding under ORS 166.715 to 166.735 may be commenced at any time within five years after the conduct in violation of a provision of ORS 166.715 to 166.735 terminates or the cause of action accrues."

Defendants argued that plaintiffs knew of the facts that gave rise to their ORICO claim more than five years before they filed the action. In short, they argued that plaintiffs' ORICO claim was premised on allegations that defendants acted in concert to make usurious loans to plaintiffs and then collect unlawful amounts of interest on those loans. Defendants asserted that, therefore, plaintiffs were aware of the excessive interest payments in 2001 when they signed the original note at a usurious rate of interest and that their ORICO claim accrued at that moment.

Defendants also addressed the "alternative" portion of the statute of limitations. They acknowledged that ORS 166.725(11) "provides in the alternative that a civil ORICO action may be brought within five years after the defendant's unlawful conduct terminates, *i.e.*, after commission of the last predicate act in a pattern of racketeering activity." However, defendants asserted that no Oregon case had

applied "or even mentioned" the "last predicate act" option of the statute. They went on to argue that the last predicate act rule had been disapproved by the United States Supreme Court in cases brought under the federal RICO statute.

The trial court agreed with defendants' arguments, stating in a letter opinion that "[t]he court does not adopt plaintiffs' position regarding the 'last predicate act,' instead, the court finds the 'accrual rule' is the rule adopted at the federal level and appears to be the preferred rule in Oregon." Under the "accrual rule," the court concluded that, once plaintiffs' made their first payment in 2001 on the original note, they were aware of their injury and the cause of their injury—the defendants' loan. Accordingly, the court concluded that the statute of limitations ran in 2006, and plaintiffs' ORICO claims were barred.

On cross-appeal, plaintiffs point out that they alleged in their complaint that defendants had violated several provisions of ORICO through conduct that occurred as late as June 2008—one year before plaintiffs filed their action. Accordingly, they contend that the trial court erred when it ignored the "last predicate act" part of the statute of limitations and concluded that the statute of limitations had run.

ORS 166.725(11)(a) provides that an action is timely if commenced within five years "after the conduct in violation of [the ORICO] terminates." That provision plainly provides that an action can be brought within five years of the last act that violated the ORICO. We see no other way to interpret the statute. We reject defendants' assertion that the opinion of a federal court addressing the "last predicate act" rule has any bearing on the meaning of Oregon's statute. The federal courts were interpreting a federal statute that does not contain an explicit statute of limitations, let alone any text that resembles that of ORS 166.725(11)(a).

Plaintiffs alleged violations of ORICO that were based on conduct that occurred one year before they filed their action. Accordingly, the statute of limitations had not run against plaintiffs' ORICO claim, and the trial court erred in concluding otherwise.

## III.   CONCLUSION

We reject defendants' assignments of error, and affirm on appeal. However, because the trial court erred in granting summary judgment on plaintiffs' ORICO claim, on cross-appeal, we reverse the judgment in part, and remand to the trial court.

Affirmed on appeal; reversed and remanded on cross-appeal.